Gerald M. MARKER et al., Appellants,

v.

George P. SHULTZ, as Secretary of the Treasury of the United States Department of Treasury, et al.

No. 72–1499.

United States Court of Appeals, District of Columbia Circuit.

Argued June 6, 1973.

Decided Aug. 8, 1973.

John L. Kilcullen, Washington, D.C., with whom Bernard J. Casey, Washington, D.C., was on the brief, for appellants.

Leonard J. Henzke, Jr., Atty., Dept. of Justice, Tax Div., with whom Scott P. Crampton, Asst. Atty. Gen., and Harold H. Titus, Jr., U. S. Atty., were on the brief, for appellee Shultz and others.

John Silard, Washington, D.C., with whom Joseph L. Rauh, Jr., Elliott C. Lichtman, Washington, D.C., Daniel H. Pollitt, Chapel Hill, N.C., and Stephen I. Schlossberg, Detroit, Mich., Gen. Counsel, United Auto. Workers, were on the brief for appellee United Auto. Workers.

Bernard Dunau, Washington, D.C., with whom Plato E. Papps, and George Kaufmann, Washington, D.C., were on the brief, for appellee, International

Assn. of Machinists and Aerospace Workers.

Before McGOWAN and LEVEN-THAL, Circuit Judges, and GESELL,* United States District Judge for the District of Columbia.

LEVENTHAL, Circuit Judge:

This is an action by workers in the aerospace industry, who are required to pay union dues under compulsory union shop contracts, to enjoin Treasury officials from continuing to grant or recognize tax exemption status under § 501(c)(5) of the Internal Revenue Code in the case of any labor organization that expends tax free membership dues for partisan political campaigns as described in the complaint. The pertinent unions were permitted to intervene.

Plaintiffs claim violations of the Constitution in that—First, the candidates are being given the equivalent of a federal financial subsidy in violation of the limits imposed upon the taxing and spending powers of Congress by Article I, Section 8. Second, the workers are being compelled to provide financial support for parties and candidates they do not approve or favor, in contravention of their rights under the First, Fifth and Ninth Amendments. Plaintiffs alleged standing to bring this action as individuals to protect their own constitutional rights; as taxpayers; and as private attorneys general to raise questions of substantial public importance.

The District Court, 337 F.Supp. 1301, denied plaintiffs' request for a three-judge district court to hear and decide these questions, and ordered the complaint dismissed. We affirm. We need not consider the various issues posed by the objections to the lawsuit on the ground of lack of standing, for although they may have merit they are not as clear cut, in terms of being governed by controlling precedent, as the issues on the merits. The pertinent Supreme Court precedents which show that plaintiffs' constitutional challenges lack any substantial foundation, establish that the District Court was correct in dismissing this action with prejudice, and in doing so without moving to have a three-judge district court convened.

1. Plaintiffs' claim as dissenting dues payers is entitled to legal protection. But as the District Court pointed out, the very Supreme Court cases that establish the right of dissenting union members to be free of political use of their dues also establish limitations on the remedies to which they are entitled. Machinists v. Street, 367 U.S. 740, 81 S. Ct. 1784, 6 L.Ed.2d 1141 (1961); Railway Clerks v. Allen, 373 U.S. 113, 83 S. Ct. 1158, 10 L.Ed.2d 235 (1963). In both these cases suit was brought by employees complaining that dues exacted under compulsion of a Railway Labor Act union shop contract were being spent for political candidates and causes they opposed. In *Street*, the Georgia court found for the employees and enjoined the enforcement of the union shop. In *Allen*, the North Carolina court found for the employees and enjoined the collection of dues beyond those shown by the unions to be the portion necessary for collective bargaining. In each case the Court held that plaintiffs' claims had a constitutional aura which impelled a construction of the Railway Labor Act narrowed so as "to deny the unions, over an employee's objection, the power to use his exacted funds to support political causes which he opposes." 367 U.S. at 768–769, 81 S. Ct. at 1800. But the Court held that the broad remedy of the lower court was erroneous because it unduly restricted the majority's rights of political expenditure and action.[1]

* Sitting by designation pursuant to 28 U. S.C. § 292(a).

1. In a crucial passage, quoted by the District Court, the *Machinists* opinion stated (at 773, 81 S.Ct. at 1802):

Moreover, the fact that these expenditures are made for political activities is an additional reason for reluctance to impose such an injunctive remedy. Whatever may be the powers of Congress or the States to forbid unions

In *Machinists*, the Supreme Court outlined the remedies available to the dissenters which would protect their rights without infringing on the rights of others. They could enjoin expenditures for political causes of that portion of their dues payment which was ascribable to political activities, or they could obtain restitution to each individual employee of that portion of his money which the union expended, despite his notification, for the political causes to which he had advised the union he was opposed. In *Allen* the Court refined the procedure a dissenting employee should follow to obtain such a refund.

 In short, while plaintiffs' rights as dissenting union members must be protected by the courts, the remedies were limited to restitution and to injunction directed against specific union activities. The accommodation of the rights of dissenters and majority members of the union prevents the kind of broadside relief that threatens to infringe on the rights of the majority members of the union. The application of that doctrine in cases that involve the statutes regulating labor relations, laws that injected a compulsion pointed toward the union shop contract by compelling bargaining over the demand, has vitality a fortiori for application to an attack on a tax exemption which is challenged at most as providing an indirect subsidy. While *Street* did not define the rights of the dissenters in constitutional terms, the opinion plainly "contains constitutional overtones," Seay v. McDonnell Douglas Corp., 427 F.2d 996, 1004 (9th Cir., 1970). *Seay* holds open the possibility that use of plaintiffs'

dues constitute a breach of the duty of fair representation, which provides a legal remedy under § 301 of the Labor Management Relations Act.

██ To avoid misunderstanding, the foregoing does not premise that unions have an unrestricted right to use dues money for political purposes. Congress has put limits on what unions may do with dues money, Pipefitters Local Union No. 562 v. United States, 407 U.S. 385, 92 S.Ct. 2247, 33 L.Ed.2d 11 (1972). Yet the precedents do establilsh that to some extent, at least, a union's claim of a constitutional right to engage in political activity could not be terminated without raising "the gravest doubt" as to constitutionality, see United States v. CIO, 335 U.S. 106, 121, 68 S.Ct. 1349, 92 L.Ed. 1849 (1948), and "issues not less than basic to a democratic society," United States v. International Union, U.A.W., 352 U.S. 567, 570, and see 589 ff., 77 S.Ct. 529, 531, 1 L.Ed. 2d 563 (1957).

Plaintiffs say that their remedies against the Union are wholly illusory. Yet that remedy defines their right, under existing rulings. If there is some lack of good faith or other defect in administration by their unions, they may pursue a remedy against the unions. And indeed that is exactly what has been done in a litigation pending in the *Seay* case, *supra*, brought in the Ninth Circuit by a class of plaintiffs that includes plaintiffs in this action.

2. Plaintiffs in effect assert that the foregoing precedents must be swept away under a doctrine that compels recognition that tax exemptions are inherently subsidies of organizations exempt-

---

altogether to make various types of political expenditures, as to which we express no opinion here, many of the expenditures involved in the present case are made for the purpose of disseminating information as to candidates and programs and publicizing the positions of the unions on them. As to such expenditures an injunction would work a restraint on the expression of political ideas which might be offensive to the First Amendment.

For the majority also has an interest in stating its views without being silenced by the dissenters. To attain the appropriate reconciliation between majority and dissenting interests in the area of political expression, we think the courts in administering the Act should select remedies which protect both interests to the maximum extent possible without undue impingement of one on the other.

ed from taxation, and all their activities, and that the tax authorities must be enjoined to take action to refine the extent of exemption so as to be inapplicable to those portions of their activities. Plaintiffs argue, in effect, that it is not enough for Congress to have passed certain statutes that prohibit a union from making political use of union dues, see 18 U.S.C. § 610, for the Constitution requires Congress to go further and remove any labor unions that should engage in such activity from the general income tax exemption provided as to receipt of union dues.

■ Plaintiffs' contention pushes to unsound extremes both the logic and force of the precedents relied on in the three-judge court decisions in *Green*[2] and *McGlotten*[3] which struck down tax deductions and exemptions that benefited racially segregated private schools (*Green*) and fraternal organizations that excluded blacks from membership (*McGlotten*).

■ More important, plaintiffs ignore what those opinions were careful to recognize, the force of Walz v. Tax Commission, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970), which held that a property tax exemption for religious organizations does not violate the Establishment Clause of the First Amendment, there being no "genuine nexus between tax exemption and establishment of religion." In terms of strictest logic, a tax exemption does involve a kind of state involvement, but as *Walz* pointed out it is a "minimal and remote involvement," 397 U.S. at 676, 90 S.Ct. 1409, that does not constitute such state support for or participation in the various

activities undertaken by the organization as to be equivalent, in constitutional terms, to a tax and appropriation for those purposes. A tax exemption is consistent with a "benevolent neutrality" and government non-involvement with the exempted organization.

■ Plaintiffs are relying in effect on an implied First Amendment clause, that the reciprocal of a free exercise of rights of association and political rights is the requirement that the Government may not establish a political movement. That is a proper conclusion but it adds nothing to plaintiffs' cause. Since, as *Walz* holds, a tax exemption with a neutral stance, not rooted in a purpose to give aid, does not constitute an establishment of religion, which is expressly forbidden by the Establishment Clause of the First Amendment, it does not constitute the kind of establishment of political support that is impliedly prohibited by the First Amendment.

Plaintiffs misapprehend the basis and reach of *Green* and *McGlotten*, involving charitable organizations engaged in racially restrictive policies. There the courts were confronted with a combination of (a) a provision inserted in the law to give positive Government support —including benefits (tax deductibility) to donors making supporting contributions—to organizations substituting for the government in performing beneficial functions and (b) constitutional rights rooted in the Civil War and the Amendments passed in the wake of the Civil War, which operate to eradicate any government involvement whatever, however "minimal and remote," that might in any way foster racial discrimination in the schools.[4] This distinction was

2. Green v. Kennedy, 309 F.Supp. 1127 (D.D.C., 1970), appeal ·dismissed sub nom. Cannon v. Green, 398 U.S. 956, 90 S.Ct. 2169, 26 L.Ed.2d 539 (1970) (*Green* I); Green v. Connally, 330 F. Supp. 1150 (D.D.C., 1971), affirmed sub nom. Coit v. Green, 404 U.S. 997, 92 S.Ct. 564, 30 L.Ed.2d 550 (1971) (*Green* II).

3. McGlotten v. Connally, 338 F.Supp. 448 (D.D.C., 1972).

4. This analysis is confirmed by the Supreme Court's issuance, subsequent to the preparation of the foregoing, of Norwood v. Harrison, 413 U.S. 455, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973). The Court cited Green v. Connally, *supra* note 2, as an example of the proposition that a State must "steer clear . . . of giving significant aid to institutions that practice racial or other invidious discrimination."

noted in *Green, supra* note 2, 330 F. Supp. at 1168–1169, and following cases. See, *e. g.*, Pitts v. Wisconsin Department of Revenue, 333 F.Supp. 662, 668 (E.D. Wis.1971). Even under the *Green-Mc-Glotten* approach state support consisting only of furnishing services equivalent to the necessities of life, such as police and fire protection provided to all without any connotation of approval vel non, does not constitute fostering or encouragement of racial discrimination that is constitutionally objectionable. Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 173, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972). There is no constitutional wrong when a state involvement in an institution is devoid of any nexus with the activity causing injury.

These precedents are dispositive. The tax exemption granted to receipt of dues by labor unions was not based on support of each aspect of their activities, but rather on the concept that what was involved was essentially a pooling of the individual resources of the members, as contrasted with entrepreneurial profit of corporations. This appears from the history of the exemption, which first appeared in 1909.[5] Plaintiffs are not protected by the Constitution from a Governmental decision that union dues, or other cooperative contributions, as to an agricultural or fraternal organization, are not proper objects of taxation.

Nor in view of the Supreme Court precedents already discussed may plaintiffs soundly claim that the Constitution requires the Treasury to become involved in the operating activities of the organizations receiving such exemptions, and in deciding which of their activities are objectionable political activities and which are within the First Amendment right of unions to promote their interests. In 1969, and 1971, the Congress rejected moves to terminate the exemption begun in 1909, if dues were used by a union in political campaigns.[6] The leading statement in opposition pointed out that the tax law does not make exemption dependent on abstention from political activity in the case of such organizations as trade associations and chambers of commerce; that it would be unsound to condition tax exemptions on refraining from political activity; that the penalty of loss of exemption would be disproportionate to the abuse; and that the regulation of political activity by labor unions was already covered by 18 U.S.C. § 610, and this in a more rational manner than loss of tax exemption.[7]

It is not for this court to appraise the policy considerations brought out in these debates. It suffices to say that what was involved was the determination by Congress to keep the tax exemption of dues and contributions in a neutral stance, rather than to embroil the tax laws and the agencies administering them into involvement with and surveillance of the political activities of the unions. The *Walz* and *Moose Lodge* doctrines make clear that Congress's choice was not unconstitutional.

Affirmed.

---

5. See 44 Cong.Rec. 3937–38, 4149, 4154–55 (1909) for debate on exemptions from excise tax imposed in Payne-Aldrich Tariff Act of 1909. Unions were exempted along with *e. g.*, agricultural and horticultural organizations, fraternal beneficiary societies, domestic membership building and loan associations. Sec. 38, 36 Stat. 11, 113. The same exemptions were carried over into the first income tax act, see Sec. IIG(a), Income Tax Act of 1913, c. 16, 38 Stat. 114, 172.

6. Such proposals were made by Senator Fannin, defeated 59 to 27, 115 Cong.Rec. 37,624 (Dec. 8, 1969), and by Senator Dole, defeated 71 to 10, 115 Cong.Rec. 38,318 (Dec. 10, 1969). Senator Fannin's proposal was introduced again in 1971, and defeated 61 to 31, 117 Cong. Rec. 42,371 (Nov. 19, 1971).

7. Statement of Senator Walter E. Mondale, 115 Cong.Rec. 36,721–23.