**Albert J. WAHBA, Plaintiff-Appellant,**

v.

**NEW YORK UNIVERSITY and Severo Ochoa, Defendants-Appellees.**

**No. 353, Docket 73–2143.**

United States Court of Appeals, Second Circuit.

Argued Jan. 16, 1974.

Decided Feb. 11, 1974.

Stanley Faulkner, New York City (Faulkner & Schmidt, New York City, of counsel), for appellant.

George I. Harris, New York City (Burke & Burke and Thomas C. Crane, New York City, of counsel), for defendants-appellees.

Before MOORE, FRIENDLY and AN-DERSON, Circuit Judges.

FRIENDLY, Circuit Judge:

This appeal presents another variation on the pervasive theme of what constitutes government action. The complaint, filed in the District Court for the Southern District of New York, alleged the following: Plaintiff was a research associate professor in the Biochemistry Department of the New York University School of Medicine. Defendant Ochoa was chairman of the Department. Beginning in 1957, the New York University Medical Center received a series of annually renewed grants from the National Institute of Health (NIH), a component of the United States Department of Health, Education, and Welfare, for a program of basic research on Enzymic Mechanisms in Biosynthesis. The initial grant application designated Dr. Ochoa as "Principal Investigator;" Dr. Wahba was later listed as a participant.

In January 1969 Dr. Wahba was invited to discuss the work he had been doing at a June symposium sponsored by the Cold Spring Harbor Laboratory of Quantitative Biology. Dr. Wahba accepted the invitation and subsequently agreed to submit a related manuscript for publication in the laboratory's journal. In September, the complaint alleged, Dr. Ochoa rebuked plaintiff for having sent the manuscript without clearance and without including Dr. Ochoa's name. He demanded that Dr. Wahba write that experiments performed after submission of the manuscript made it desirable to withhold publication. Deeming this to be untrue, plaintiff refused to sign. Dr. Ochoa then removed Dr. Wahba from work on the research project and demanded that Cold Spring Harbor Laboratory cancel publication of the manuscript. About two months later, plaintiff was advised that his contract as a research associate professor would not be renewed upon its expiration on August 31, 1970. Prior to that time, Dr. Wahba obtained other employment at a medical school in Montreal. Apparently having suffered no economic loss, plaintiff requested punitive damages of $250,000 for harm to his reputation and emotional suffering.

In their answer, defendants attributed Dr. Ochoa's refusal to allow publication of the manuscript to the well-recognized scientific practice that papers emanating from group research shall not be published without the advance approval of the principal investigator. They added that Dr. Wahba's manuscript contained assertions that were at variance with findings of other investigators in the Department of Biochemistry which were then being prepared for publication. They also noted that despite Dr. Ochoa's protests, Dr. Wahba's manuscript was published. Alleging that it had continued to pay plaintiff's salary through February 1970, although he had been paid by the Sherbrooke University School of Medicine since January 2, defendant New York University counterclaimed for the two months' pay.

On the basis of affidavits of an attorney and two University officials,[1] accompanied by copious exhibits, defendants moved for dismissal of the complaint or summary judgment in their favor on the basis that their conduct did not constitute government action. Judge Knapp granted the motion for summary judgment in defendants' favor; he later issued the appropriate certificate under F.R.Civ.P. 54(b), noting that the pendency of the counterclaim afforded no just reason for delaying the entry of judgment. Plaintiff has appealed.

■ It is not clear from his complaint whether plaintiff seeks recovery for his dismissal from the research project, or for the University's failure to renew his one-year contract without according him a due process hearing, or for both. As a non-tenured faculty member, in order to sustain his claim that he was dismissed without the requisite procedural protections, he would have to show some deprivation of liberty or property under the criteria established in Board of Regents v. Roth, 408 U.S. 465, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).[2] Beyond this, however, Dr. Wahba appears to claim that he was denied First Amendment rights by virtue of Dr. Ochoa's demand that he withdraw his paper, and that he was denied due process by being severed from the research program without a hearing. We find it unnecessary to differentiate among the various possible claims raised in the complaint, since we are unable to discern the government action necessary to sustain any of them.

Plaintiff characterizes his situation as analogous to that of the students at the New York State College of Ceramics at Alfred University, discussed in Powe v. Miles, 407 F.2d 73 (2 Cir. 1968). As to the Ceramics College students, we found state action in the administration of discipline even though this was done by the President and Dean of Students of Alfred, who were not state officials, and the acts of the students were committed outside the Ceramics College. The distance separating this case from that of the New York State Ceramics College is sufficiently shown by quoting the most pertinent portion of our opinion, 407 F. 2d at 82–83:

We hold that regulation of demonstrations by and discipline of the students in the New York State College of Ceramics at Alfred University by the President and the Dean of Students constitutes state action, for the seemingly simple but entirely sufficient reason that the State has willed it that way. The very name of the college identifies it as a state institution. In part I of this opinion we have extensively reviewed the statutes

---

1. The University officials who submitted affidavits were Thomas A. Fitzgerald, Assistant Comptroller and Director of Research and Training Program Management at the Medical Center, and Miguel de Capriles, the Vice President and Secretary of the University. The latter set forth that while New York University has a tenure system, Dr. Wahba's appointment was probationary and without tenure implications. It recited a by-law whereby research professors, research associate professors, and research assistant professors are considered to have non-tenure positions which "shall be for a definite period of time, not exceeding one academic year unless otherwise specified, and [which] shall automatically terminate at the close of that period unless there is an offered notice of renewal."

2. In order to demonstrate a deprivation of liberty, Dr. Wahba would have to prove that the reasons given for the denial of his re-employment would "seriously damage his standing and associations in his community," or impose upon him "a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities," Roth, 408 U.S. at 573, 92 S.Ct. at 2707. To prove a deprivation of property, he would have to prove not just "a unilateral expectation" of continued employment, but "a legitimate claim of entitlement to [it]," by showing, for example, that the University's yearly contract renewal system amounted to "a de facto tenure program." Sindermann, 408 U.S. at 600, 92 S.Ct. at 2700. See Russell v. Hodges, 470 F.2d 212, 216–217 (2 Cir. 1972); Simard v. Board of Education, 473 F.2d 988, 992 (2 Cir. 1973).

making the college an integral part of the State University; it suffices here to cite Education Law § 6102, whereby Alfred University maintains discipline and determines educational policies with respect to the State College "as the representative of the state university trustees." We see no reason why the State should not be taken at its word. The statutory provisions are not mere verbiage; they reflect the Legislature's belief that the citizens of New York would demand retention of State control over an educational institution wholly supported by State money. If the discipline had been administered by the Dean of CC, all of whose salary is paid by the State, because of acts of CC students in the State-owned buildings, the existence of state action would hardly be doubted. We do not think a different result is justified because here the CC students were demonstrating on another part of the campus, which the State's payments on their behalf entitled them to enter for proper purposes, and the authority was exercised by delegates of the State who also have other roles. While even as to the CC students the President and the Dean of Students may lack the symbolic tie with the state furnished by the deputy sheriff's badge in Griffin v. Maryland, supra, [378 U.S. 130, 84 S.Ct. 1770, 12 L.Ed.2d 754] or the public building in Burton v. Wilmington Parking Authority, supra, [365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45] the students of the New York State College of Ceramics can properly regard themselves as receiving a public education and entitled to be treated by those in charge in the same way as their counterparts in other portions of the State University. If the State wanted Alfred's policy on demonstrations changed for the CC students, mere order of the State University trustees would suffice, Education Law § 355(1)(a), and (2)(b); no general legislation would be needed, as it would be if the State desired to control the policy for other students. However one characterizes Alfred's relationship to the State with respect to the New York State College of Ceramics, it is much closer than that of an independent contractor. The State furnishes the land, buildings and equipment; it meets and evidently expects to continue to meet the entire budget; it requires that all receipts be credited against that budget, Education Law § 6102; and in the last analysis it can tell Alfred not simply what to do but how to do it.

This, however, does not end the case. Plaintiff claims that the relationship established by the research grant sufficiently involves the United States to carry the First Amendment and the due process clause of the fifth over to New York University's dealings with him.

The application for the initial grant stated the names, so far as available, and included biographical sketches of all the personnel whose salaries were to be funded; Dr. Wahba's name was not listed. The grant included the salaries, certain other itemized expenses, and 20% of the total for indirect costs. Dr. Wahba's name first appeared in answer to a request for the names and title of "all other professional personnel engaged in the project" in an application for continued support through August 31, 1964; he was not, however, among those whose salaries were to be reimbursed. The same pattern continued thereafter. Papers co-authored by Dr. Wahba were mentioned in several of the applications. The research was thus a project of the Biochemistry Department of the New York University School of Medicine carried on with the collaboration of a number of University-paid personnel and on University facilities. The University received no federal payment for the services of the personnel or the use of the facilities except insofar as these were covered by the 20% allowance for incidental costs.

Plaintiff cites a Policy Statement of the Department of Health, Education,

and Welfare, revised July 1, 1967. This clearly informs grantees that

> Public Health Service grants and awards must be administered in conformance with the Civil Rights Act of 1964; the regulation (45 CFR, Part 80) issued pursuant thereto by the Department of Health, Education, and Welfare; and the grantee's Assurance of Compliance (Form HEW-441), on file with the Public Health Service.

Plaintiff makes no contention that the defendants have violated Title VI of the 1964 Civil Rights Act, which provides, 42 U.S.C. § 2000d, that "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Instead, he relies on general language in the Policy Statement which we set forth in the margin.[3] This, says the plaintiff, is clear evidence that the Federal Government regards itself as "a partner or . . . a joint venturer" in the research project, see Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 177, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972).

 As indicated in Powe v. Miles, supra, 407 F.2d at 82–83, and Grafton v. Brooklyn Law School, 478 F.2d 1137, 1141–1143 (2 Cir. 1973), we do not find

decisions dealing with one form of state involvement and a particular provision of the Bill of Rights at all determinative in passing upon claims concerning different forms of government involvement and other constitutional guarantees. In any event there was here no partnership or joint venture in the ordinary meaning of those words. As against the language of the Policy Statement on which plaintiff relies, another paragraph states:

> Administration of a grant-supported research project is a joint undertaking by the grantee and the principal investigator. The grantee assumes responsibility for fiscal and administrative management and fulfillment of any special conditions which may be prescribed for the conduct of the research. The principal investigator and the grantee institution share responsibility for the conduct of the research and for using grant funds prudently for the purposes set forth in the application and Notice of Grant Awarded.

The venture was to be that of New York University and Dr. Ochoa, undertaken with government support. What NIH wanted least was to share responsibility for its administration.

The Court in *Moose Lodge* could not have meant the reference to partners or

---

3. This Policy Statement should be used by grantee institutions as the source of the basic policy requirements under which Public Health Service research grants are administered. Under the terms of a research grant, the institution and the principal investigator enter into a special relationship with the Public Health Service for the utilization of grant funds. This relationship results from the basic nature of the grant as a conditional gift in response to a request for support of a project in which there is a substantial measure of public interest.

A grant, therefore, represents a mutual joining of interests on the part of the grantor and the grantee institution in the pursuit of a common objective. In this relationship, the grantee institution assumes with the grantor the obligation to act in the public interest in achieving a common purpose. This is a relationship of trust which imposes upon the grantee institution the responsibility to assure that the grant funds are utilized for the purpose for which they were awarded, and to exercise the same probity and prudence in their expenditure that is extended to the use of the grantee institution's own funds.

It is to these broad obligations that a recipient of a Public Health Service grant is accountable. This Policy Statement does not attempt to specify the full extent of the considerations which should bear upon a grantee institution in the use of grant funds. The Public Health Service is concerned with assessing the adequacy of administrative practices and the prudence exercised by the grantee institution to assure conformity with the terms of this Policy Statement.

Examination of the administrative processes utilized in the expenditure of grant funds is a continuing responsibility of the Public Health Service in the administration of these programs.

joint venturers to be satisfied with some commonalty of economic interests *simpliciter,* since as a comment has pointed out, The Supreme Court 1971 Term, 86 Harv.L.Rev. 1, 73–74 (1972), such interests existed in a substantial degree in that case itself. The lodge received from the state permission to operate a lucrative business and obtained a valuable property right in the liquor license itself; the state operating a monopoly system, was provided with a distributor that produced substantial revenue. Reconciliation of *Moose Lodge* with Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), where the reciprocity of economic interests was not measurably greater, must rest on the difference between a private club and a restaurant in a public building. However offensive the exclusion of blacks from a social club holding one of a restricted number of state liquor licenses, the Court thought it significantly less than their exclusion from a restaurant in a building owned and operated by a public authority and whose construction and maintenance were paid by public funds. As Mr. Justice Clark so eloquently said in *Burton,* 365 U.S. at 724–725, 81 S.Ct. at 861,

> It is irony amounting to grave injustice that in one part of a single building, erected and maintained with public funds by an agency of the State to serve a public purpose, all persons have equal rights, while in another portion, also serving the public, a Negro is a second-class citizen, offensive because of his race, without rights and unentitled to service, but at the same time fully enjoys equal access to nearby restaurants in wholly privately owned buildings.

Plaintiff likewise derives little benefit from two leading and oft-cited cases relating to government grants, Kerr v. Enoch Pratt Free Library, 149 F.2d 212 (4 Cir.), cert. denied, 326 U.S. 721, 66 S.Ct. 26, 90 L.Ed. 427 (1945), and Simkins v. Moses H. Cone Memorial Hospital, 323 F.2d 959 (4 Cir. 1963) (*en banc*), cert. denied, 376 U.S. 938, 84 S.Ct. 793, 11 L. Ed.2d 659 (1964). Apart from the point that both involved racial discrimination, the relative amount of public support in *Pratt* had become so great that in practical effect the city had simply chosen to allow private trustees to operate a public agency, and in *Moses H. Cone* the federal government had involved North Carolina in administering the clearly unconstitutional "separate but equal" provision of the Hill-Burton Act, 60 Stat. 1041, 1043 (1946). Pointing in defendants' favor but not truly decisive are Grossner v. Trustees of Columbia University, 287 F.Supp. 535 (S. D.N.Y.1968), and our own decision in Grafton v. Brooklyn Law School, supra, 478 F.2d 1137. In *Grossner,* Judge Frankel refused to find state action, in the context of student discipline, despite Columbia's receipt of over 40% of its total revenues from the federal government, together, of course, with the benefits of federal, state and local tax exemption. Similarly, in *Grafton* we rejected the plaintiff's contention, in the context of First Amendment and due process claims, that the conduct of the law school officials constituted state action because of a combination of the school's tax exemption, the sale of a site by New York City at a price so low that the school ultimately paid nothing for the portion of the land on which it was built, a $400 payment by the State for each degree awarded, and State regulations setting criteria for the law school curriculum that would qualify an applicant to take the state bar examination. We are left therefore with the task of "sifting facts and weighing circumstances" imposed by Mr. Justice Clark's opinion in Burton v. Wilmington Parking Authority, *supra,* 365 U.S. at 722, 81 S.Ct. 856, 6 L.Ed.2d 45 a procedure which, despite contemporary criticism of the opinion for failure to afford sufficient guidance,[4] has survived much bet-

---

4. See Lewis, Burton v. Wilmington Parking Authority—A Case Without Precedent, 61 Colum. L.Rev. 1458 (1961).

ter than attempts at more definitive formulations.

■ As the writer has suggested elsewhere,[5] determination of government action in such cases as this hinges on the weighing of a number of variables, principally the degree of government involvement, the offensiveness of the conduct, and the value of preserving a private sector free from the constitutional requirements applicable to government institutions. Here, while NIH funded the salaries of personnel engaged full-time in the project, one of the very reasons for its having this research conducted by the New York University School of Medicine, rather than performing the work itself, was to enlist the participation of other members of the Department of Biochemistry, notably the principal investigator, Dr. Ochoa, a scientist of international renown who had won the Nobel Prize in Physiology and Medicine in 1959. The Policy Statement makes the principal investigator "responsible for the scientific and technical direction of the project"; if he should cease to serve in that capacity, the grant is ended unless the grantee chooses to nominate a successor satisfactory to NIH. The form and manner of publication of results are left entirely in private hands.

■ This kind of arrangement, whereby federal funds are used to prime the pump of research effort in private scientific institutions which the Government could not perform as well, has social values too obvious to require elaboration. Only rarely are professors of Dr. Ochoa's eminence willing to enter 'government service in peacetime. It is equally clear that scientists of his reputation on the staffs of private institutions, with a wealth of choices before them, are not likely to be willing to undertake projects under public grants if they are deprived of the freedom of management which they consider necessary and would have in projects not governmentally financed. It is hardly an attractive prospect for a research scientist to be forced to divert time from scientific inquiry to appear before a court or even a university board to justify such decisions as his refusal to allow a participant in his research project to make what he considers a premature and ill-advised publication;[6] even less inviting is the prospect that the hearing board, in construing what it deems to be its constitutional mandate, may require him to allow such publication. Congress has specified one constitutional command, a prohibition of racial discrimination, which those engaging in federally financed projects must respect. This very specification affords some indication that the Government did not mean to require compliance with other constitutional guarantees; we do not think the Constitution imposes them *proprio vigore.*

At argument appellant's counsel called our attention to McQueen v. Druker, 438 F.2d 781 (1 Cir. 1971). Dealing with a low and moderate income housing project under § 221(d)(3) of the National Housing Act, 12 U.S.C. § 1715l(d)(2), the court held that a landlord who had received the very substantial aid which the federal program provided could not evict a tenant whose lease had not been renewed because of the tenant's "associational activities" on behalf of fellow tenants; the court avoided passing on further claims with respect to what, if any, notice and hearing in addition to normal state court eviction proceedings would be required in cases not present-

---

5. The Dartmouth College Case and the Public-Private Penumbra (University of Texas at Austin, 1969).

6. We recognize that many private universities have established boards to pass on the discipline of students and to make employment decisions regarding untenured faculty. Developments in the Law—Academic Freedom, 81 Harv.L.Rev. 1045, 1101–04, 1157–59 (1968). But these are flexible measures voluntarily adopted by the schools themselves. Furthermore, plaintiff's position would necessarily entail that decision of such a board with respect to a project financed by a federal grant would be subject to at least some judicial review.

ing what the court considered a valid First Amendment defense.

We are not here required to decide whether we would follow *McQueen*, despite our holding in Langevin v. Chenango Court, Inc., 447 F.2d 296 (2 Cir. 1971), that tenants under the same program were not entitled to a hearing on a rent increase which the FHA had approved.[7] The government involvement in a § 221(d)(3) project is arguably greater than under a NIH grant. The basis of the holding in *McQueen* was "that at least when a specific governmental function is carried out by heavily subsidized private firms or individuals whose freedom of decision-making has, by contract and the reserved governmental power of continuing oversight, been circumscribed substantially more than that generally accorded an independent contractor, the coloration of state action fairly attaches," 438 F.2d at 784–785. See also Joy v. Daniels, 479 F.2d 1236, 1238–1239 (4 Cir. 1973). As previously indicated, there is no similar circumscription of decision-making here. Coming to our second criterion, we think the offensiveness of refusing to renew a lease in retaliation for a tenant's efforts to protect his rights and those of his fellows, see 438 F.2d at 785 and n. 8, considerably outruns the action of a principal investigator in controlling publication by a subordinate—even if, as Dr. Wahba asserts, Dr. Ochoa's interest was to have his name included.[8] Finally, there is much less possibility of harm to a § 221(d)(3) project by prohibiting eviction because a tenant has engaged in "associational activities" for the benefit of tenants, than in loading a basic research program with the full panoply of First Amendment and Fifth Amendment due process rights. *McQueen*, whether we ultimately follow it or not, thus does not dictate reversal here.

We mention a final point, only to avoid any suggestion that we have implicitly ruled upon it. Unlike the plaintiff in *McQueen* who somehow was allowed to spin a violation of 42 U.S.C. § 1983 relating to action under color of *state* law, and consequent jurisdiction under 28 U.S.C. § 1343(3), out of *federal* involvement, a mystery not discussed by the court,[9] Dr. Wahba has forthrightly placed his case under the principle of Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), with jurisdiction resting on the general federal question section, 28 U.S.C. § 1331. Although the *Bivens* Court did not rule out the possibility of private damages actions for violation of other constitutional rights by federal officers, the decision was limited to violations of the Fourth Amendment. Mr. Justice Harlan, concurring, was at pains to note that "the experience of judges in dealing with private trespass and false imprisonment claims supports the conclusion that courts of law are capable of making the types of judgment concerning causation and magnitude of injury necessary to accord meaningful compensation for invasion of Fourth Amendment rights," whereas this "may not be true with respect to other types of constitutionally protected interests,

---

7. The *McQueen* decision, handed down some five months previously, was not brought to our attention by the parties in *Langevin* and we were not aware of it. Our result accorded with the First Circuit's decision with respect to rent increases in Hahn v. Gottlieb, 430 F.2d 1243 (1970), involving the same project as *McQueen*, although we reached it by a different path. For a full discussion see, without connotation of full approval, Note, Procedural Due Process in Government-Subsidized Housing, 86 Harv.L.Rev. 880 (1973).

8. While this issue of fact—strongly contested by defendants—could not be decided on a motion for summary judgment, we note that 'many publications listed in applications to NIH, including some in which Dr. Wahba was an author, did not include Dr. Ochoa's name. Strong proof would be needed to warrant a conclusion that a scientist whose name was on scores of publications would be vitally interested in one more.

9. The district court had made an attempt at explanation, 317 F.Supp. 1122, 1133 (D. Mass.1970), but we find this rather unconvincing.

and therefore the appropriateness of money damages may well vary with the nature of the personal interest asserted," 403 U.S. at 409 and n. 9, 91 S.Ct. at 2011. We need say only that we regard the question as open.

Affirmed.