The **NEW YORK CITY JAYCEES, INC.**, Plaintiff,

v.

**UNITED STATES JAYCEES, INC.**, and **New York State Jaycees, Inc.**, Defendants.

**No. 74 Civ. 652.**

United States District Court, S. D. New York.

June 13, 1974.

Doman, Stuchiner & Beggans, New York City, for plaintiff; Sheila Maura Kahoe, New York City, of counsel; Ronald Edward Pump, New York City, on the brief.

Steptoe & Johnson, Washington, D. C., for defendant, United States Jaycees, Inc.; Robert J. Corber, Washington, D. C., of counsel.

GURFEIN, District Judge:

The New York City Jaycees, Inc. ("Local") sues to enjoin the United States Jaycees, Inc. ("National") and the New York State Jaycees, Inc. ("State") from revoking the Charter of the plaintiff.

The plaintiff has a charter granted by the national body. The by-laws of National provide that active membership is limited to young men between the ages of 18 and 36 of good moral character. It has been interpreted to exclude otherwise qualified female applicants.

Local had the same by-law and the same interpretation. On May 18, 1971 a proposal was made that the by-law be amended to strike the word "men" and to substitute the word "people." This was passed by the membership on May 31, 1973.[1]

In June, some women paid their dues and were admitted to the local chapter, and in August the dues were remitted to National by Local. In October, National notified Local that the dues would not be accepted without written verification that all members were male. Thereafter National took the dues but listed the women as "associates."

On October 10, 1973 the plaintiff received a notice that it was in violation of the by-laws of the defendant National which prohibited active membership for women. The plaintiff was ordered to show cause at the Executive Board of Directors meeting on February 16, 1974 why the plaintiff's charter should not be revoked. On February 11, 1974 this Court issued a temporary restraining order to prevent revocation of the charter.

A motion was made for a preliminary injunction and adjourned by consent. In the meantime, National proceeded to revoke the charter of Local but suspended the effectiveness of the revocation pending the determination of this action.[2]

The defendant National moved to quash service of the summons and complaint upon the ground that the Court lacked jurisdiction over its person. Rule 12(b)(2), Fed.R.Civ.P. Decision on this motion was reserved.

An evidentiary hearing was held on April 9, 1974 on the motion for a preliminary injunction.

I

*The Facts Found*

The plaintiff is incorporated in New York; the defendant National[3] in Missouri. National's headquarters are located in Tulsa, Oklahoma.[4] National began in 1915 in St. Louis as the Young Men's Progressive Civic Association. In 1920 the organization became the Junior Chamber of Commerce. In 1965 it changed its name to the United States Jaycees, Inc. Currently there are 6,500 local chapters in each of the 50 states and the District of Columbia with membership lists running approximately 325,000 in number. There are additionally international affiliates in 82 countries.[5]

Local was founded in 1926 under the name Young Men's Board of Trade. In

---

1. Before it amended its by-laws, Local was advised by the New York Attorney General that he would construe failure to do so as a violation of N.Y. Executive Law § 296, subd. 6.

2. Ex. B to Supplemental Warfield Affd.

3. State is not an active defendant. When defendant is mentioned without further identification, it means National.

4. Roper Tr. 47–48.

5. Zirk Affd.

1948 it was granted a charter by National. Its name was changed in 1965 to New York City Jaycees, Inc. Local has a membership of 114.[6]

The by-laws of National require that Local's by-laws "not contain provisions contrary to [the] by-laws [of the United States Jaycees] or the Constitution of its existing state organizations . . ." Article IV By-Law 4–2.[7]

The National structure consists of a nineteen member executive committee and the presidents of all the states and District of Columbia. This Committee has the responsibility for formulating national policy and by-laws, adopting national programs and annual budgets. There is also a paid staff at the national level.[8]

National provides services to State organizations and local chapters.[9] Although at one time its purpose was to promote the business interests of its members, in recent years it has broadened its membership, and its program emphasis is on community services. By the defendant's statement it is involved in programs for low cost housing, prevention of child abuse, convict rehabilitation, transportation for the elderly, control of the environment and many other civic activities. The plaintiff alleges, and I so find, that membership in the Jaycees is also still linked to advancement in the business community.

National is affiliated with the United Jaycees Foundation ("the Foundation") which is governed by a self-perpetuating board of seven Trustees. The original trustees at the time of formation of the trust were three in number and they were officers of the defendant. The Board reports annually to National's Board.

The fiscal year ended July 1, 1973 was the first year National received any federal funds. The budget for the year ending July 1, 1974 totals $3,639,000 of which $1,143,000 or 31.4% comes from funds supplied by the Federal Government. Of that amount, $545,085 is received by National directly from the Federal Government, the remaining federal funds coming through the Foundation. $1,200,000 comes from membership dues which are transmitted by mail to National by the State chapters after they have collected them from the locals. The part of the budget not derived from federal funds and dues comes from contributions by corporations and foundations, and the sale of supplies.

The specific federal grants and contracts break down as follows:

(a) *National* itself is a party to two federal contracts: (1) For the control of venereal disease which was entered into with the Department of Health, Education and Welfare ("HEW") in the amount of $99,923;[10] and (2) for prevention of alcohol abuse, entered into with HEW for $445,162.[11] Of the latter amount, $140,000 is given for "seed" grants to local chapters and state organizations. In 1972–73, the New York State Chapter was awarded a seed grant of $500; and the Greater Pawling Local received $50.[12]

(b) *The Foundation* is a party to three federal contracts or grants: (1) A $594,000 grant for Project Mainstream, awarded by the Office of Economic Opportunity ("O.E.O.")[13] (2) $21,500 for environmental education, funded to the extent of 19% of the total by HEW;[14] and (3) $325,363 from the Criminal Justice Program which is financed by the Manpower Administration of the Department of Labor.[15]

6.  Warfield Tr. 14.

7.  Roper Affd. 2/27/74 p. 2.

8.  Roper Tr. 45.

9.  Roper Tr. 49.

10. Ex. D.

11. Ex. E.

12. Ex. E to Warfield Affd. Outlining Funding.

13. Ex. A.

14. Ex. B.

15. Ex. C.

Project Mainstream is the largest single grant. The purpose of Project Mainstream is to develop successful self-help programs by community action agencies at the local level,[16] dealing with economic development, community relations, housing, elderly assistance, recreation and the like.[17] The New York City part of the project is for recreation in East Harlem and federal funds are used for administrative support, rent and the provision of coaches and referees. O.E.O. made the grant conditional upon acceptance of a condition barring sex discrimination.

Of the total received by the Foundation under the Mainstream project, $152,465 goes to National, and $196,535 is paid to a consulting organization known as Together, Inc. The remaining $225,000 is earmarked for "seed" grants for local organizations. The plaintiff Local has received a grant of $4,500 under this program, one-half of which has already been paid. Project Mainstream funds are available only to Jaycee Chapters in partnership with a community action agency.[18]

The Foundation has also solicited Local's involvement in another federally funded program called Project Uplift. Uplift was granted $650,000 from the O.E.O. to sponsor self-help programs.[19]

Together, Inc. has its consulting arrangement with the Foundation.[20] It coordinates and supervises Project Mainstream, and renders periodic reports to the Government, National and the Foundation.[21] Its National Advisory Council selects local Jaycee Chapters and community action agencies for awards of seed grants.[22] Four of the sixteen members of the Council are selected by National. Four of the sixteen members represent U.S. Government Departments and Agencies.[23]

The Criminal Justice Program relates to the rehabilitation of former prisoners. The other projects are explained by their names. In addition to the earmarked community programs, National's budget is used to sponsor internal leadership programs and chapter development programs.

National is a tax-exempt organization.

National maintains no offices in New York. Its officers visit New York periodically, two or three times a year, at the Local's invitation. National has a Regional Staff Officer located in Malboro, Massachusetts, who comes to New York up to ten times a year.[24]

## II

### *Jurisdiction over the Person*

■ National has moved to quash the service of process on the ground of lack of jurisdiction over the person. Fed.R. Civ.P. 12(b)(2). Local asserts *in personam* jurisdiction under N.Y.C.P.L.R. § 301 and under New York's long arm statute N.Y.C.P.L.R. § 302, prescribed by Fed.R.Civ.P. 4(e). See Gelfand v. Tanner Motor Tours, Ltd., 339 F.2d 317 (2 Cir. 1964).

N.Y.C.P.L.R. § 301. This provision preserves to New York courts "such jurisdiction over persons . . . as might have been exercised heretofore." Prior to its enactment, foreign corporations were held subject to personal jurisdiction only if they were found to be "doing business" in New York. Tauza v. Susequehanna Coal Co., 220 N.Y. 259, 115 N.E. 915 (1917). New York contin-

16. Ex. 4.

17. Project Mainstream stems from 42 U.S.C. § 2769c(c) which reads: "Programs approved under this part shall, to the maximum extent feasible, contribute to the elimination of artificial barriers to employment and occupational advancements."

18. Washington, member of the National Coordinating Council of Project Mainstream, Tr. 24–25.

19. Ex. A to Warfield Affd. Outlining Funding.

20. Ex. 5.

21. Washington Tr. 32–36.

22. Washington Tr. 24–25.

23. Pl. Ex. 3.

24. Roper Tr. 79.

ues to adhere to the traditional "doing business" test for jurisdiction over foreign corporations when the cause of action does not arise out of acts done in New York. W. Lowenthal Co. Inc. v. Colonial Woolen Mills, Inc., 38 A.D.2d 775, 327 N.Y.S.2d 899 (3d Dept. 1972).

The pertinent facts have already been related. Together they constitute "doing business" in New York under existing authority.

In B. K. Bruce Lodge, Inc. v. Sub-Committee of Management of the Grand Order of Odd Fellows in America, 208 App.Div. 100, 102, 203 N.Y.S. 149 (1st Dept. 1924), the Court held that a fraternal benefit corporation which "enforces its policies, decrees, and orders incidental to its management, and collects dues through the instrumentality of the defendant District Grand Lodge No. 2" is doing business within the State of New York.

Judge Botein in People v. Jewish Consumptives' Relief Society, 196 Misc. 579, 581, 92 N.Y.S.2d 157 (1949), reaffirmed the validity of the *Bruce Lodge* holding. He noted that "Numerous cases have pinpricked the areas of 'doing business' as applied to stock corporations engaged in commerce. The relatively few cases relating to nonprofit membership corporations do not delineate similar areas in such detail. But the common denominator for the 'business' of both types of corporation would seem to be the statutory definition, namely, 'the activities for which the corporation shall have been organized.' And on that basis most of the norms prescribed for doing business by commercial corporations appear to apply with equal validity to nonprofit corporations." There the Attorney General had sought to enjoin the Colorado based Relief Society from soliciting funds in New York. Judge Botein

wrote "[c]learly the extensive local activities of the defendant assume the shape of doing business in this State." (Id.)

National receives dues from the New York Chapter and solicits participation on projects such as Mainstream with the New York Chapter.[25] It awards "seed" subgrants for its projects to combat alcoholism for execution by the New York Chapter. It enforces its membership policies and decrees incidental to its management to insure that no women can join. And these activities have been carried on with continuity over at least the past 20 years. See Doherty v. Moreschi, 187 Misc. 175, 177, 59 N.Y.S.2d 542, 543 (1946). ("The defendant International Union is engaged in business within this state. . . . Although not primarily organized for profit, the International carries on, within this state, with reasonable continuity, the activities which it was organized to perform.") To paraphrase Frummer v. Hilton Hotels International, Inc., 19 N.Y.2d 533, 537, 281 N.Y.S.2d 41, 227 N.E.2d 851 (1967), the "pivotal question" is whether Local does all the business the National could do were the National here by its own officials.[26]

The motion to dismiss under Rule 12(b)(2) is denied.

### III

*Jurisdiction over the Subject Matter*

The complaint alleges subject-matter jurisdiction under 28 U.S.C. § 1343 and 42 U.S.C. § 1981. It further alleges that the action arises under the Fifth and Fourteenth Amendments to the United States Constitution and bases jurisdiction on 28 U.S.C. § 1331 and § 1343, alleging the requisite jurisdictional amount. It also alleges jurisdiction under 42 U.S.C. § 2000d, 42 U.S.C. § 1983

---

**25.** The officers of the National in their capacity as trustees for the Foundation have also solicited the Local's participation in Uplift.

**26.** An agency relationship, in another context, has been imputed between International

and Local Unions when the Local's membership is controlled by the International. Allen v. International Alliance of Theatrical, Stage Employees and Moving Picture Machine Operators of the United States and Canada, 338 F.2d 309 (5 Cir. 1964).

and under the N.Y. State Executive Law.

■ Jurisdiction is sustained under 28 U.S.C. § 1331, as "arising under" the Fifth Amendment, with a finding that the jurisdictional amount is properly alleged. Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946).

■ 42 U.S.C. § 1981 does not apply to sex discrimination. It deals with persons who are denied rights afforded to "white citizens." See League of Academic Women v. Regents of University of California, 343 F.Supp. 636, 638 (N.D.Cal.1972). 42 U.S.C. § 2000d in terms bars discrimination, but not on the basis of sex, see Joy v. Daniels, 479 F.2d 1236 (4 Cir. 1973).

■ Actions alleging sex discrimination where *state* action is concerned may be brought under 42 U.S.C. § 1983. Brenden v. Independent School District 742, 342 F.Supp. 1224 (D.Minn.1972), aff'd, 477 F.2d 1292 (8 Cir. 1973), but since the gravamen of the action here is against federal "governmental action" rather than "state action," jurisdiction may not be based on Section 1983. See District of Columbia v. Carter, 409 U.S. 418, 424–425, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973).

IV

*Preliminary Injunction*

The defendant contends, by way of confession and avoidance, that women are allowed to become "associates," in the Jaycees; that women are involved in community action agencies which are partners in Project Mainstream; that they participate in other programs; that female beneficiaries are not discriminated against in the implementation of the grant; that there are women on the Council of Together, Inc.; and so on.

No logical reason has been offered, however, why women cannot be full Jaycee members except that the male membership would like to keep it that way. Of course, if the Jaycees are a private organization which does not partake of "government action" and does not perform public functions, that may be its prerogative.[27] The issue is whether the Fifth Amendment applies to the internal membership policies of the Jaycees because of significant Government involvement.

The defendant maintains that there is not "significant Government involvement *in* the internal membership policies of the Jaycees" and that this commands dismissal of the complaint.

The plaintiff contends that the defendant is subject to constitutional limitations prohibiting discrimination and that it cannot lawfully exclude members or revoke the charters of chapters for failure to adhere to discriminatory polcy solely on the basis of sex. The plaintiff relies on three factors: (1) the substantial amount of Government funds administered directly and indirectly by the Jaycees; (2) the quasi-governmental or public function of the organization; and (3) the tax-exempt status of the Jaycees.

The threshold issue is whether sex discrimination, in the absence of a constitutional amendment, may be a violation of the Fifth Amendment. The Supreme Court has decided that irrational discrimination solely on the basis of sex violates the constitutional guaranties of equal protection. Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971); Frontiero v. Richardson, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973). We may assume, therefore, that irrational discrimination on the basis of sex is a violation of the Fifth Amendment if it is the result of action by the Federal Government—"state action."[28]

---

27. Subject to a possibly evolving doctrine based on tax exemption. See McGlotten v. Connally, 338 F.Supp. 448 (D.C.1972); and see Jackson v. The Statler Foundation, 496 F.2d 623 (2 Cir. 1974); but cf. Marker v.

Shultz, 158 U.S.App.D.C. 224, 485 F.2d 1003 (1973).

28. Though the specific action may be by the federal government rather than by a state,

The issue then is whether we can find in the decisions on what constitutes "state [government] action" a key that will solve our problem.

■ We know that the mere receipt of government funds is not enough to make the action of the grantee "state action." Wahba v. New York University, 492 F.2d 96 (2 Cir. 1974). If the State (Federal Government) is a "joint participant" in the challenged activity, that may suffice. Burton v. Wilmington Parking Authority, 365 U.S. 715, 725, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). But the existence of a mere regulatory scheme standing alone may not be sufficient if the actor is essentially a private organization. Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972). Yet when the state moves in to regulate the challenged activity, the acts of even a private organization may become "state action." Male v. Crossroads Associates, 469 F.2d 616 (2 Cir. 1972).[29]

We have latterly come to recognize that cases involving *racial* discrimination are more likely to be found to involve "state action" than cases involving other claims of violation of due process or First Amendment right. See e. g., *Wahba, supra,* 492 F.2d at 100; Jackson v. The Statler Foundation, *supra,* 496 F.2d at 635.[30]

Whether the emphasis on racial discrimination lies in its historic context as the "prime target of the Fourteenth Amendment", see Coleman v. Wagner College, 429 F.2d 1120, 1127 (2 Cir. 1970) (Friendly, J., concurring), or whether it lies in current mores of anti-discrimination is not altogether clear, at least with any degree of unanimity. I

prefer to think that the latter emphasis is at least equal to the former, if only as a sign of confidence in the ethos of this generation.

If that be arguably so, should we not gladly acknowledge that sex discrimination of an arbitrary character is as repugnant as race discrimination of a similar nature? I must concede that this approach is hardly a paradigm of logic, for the essence of state action viewed purely as an activity should hardly depend upon the character of its victims. Since we have accepted the illogic in the racial cases, however, we should accept it in the sex cases as well. We may, accordingly, think of sex as a suspect class not only in the test of what is discrimination but in the tilting of the scale in what constitutes state action.

■ I find that the congeries of factors here involved make the action of the United States Jaycees in attempting to revoke the charter of the New York City Chapter "state action" and subject to the jurisdiction of the federal courts.

It is true that one cannot point to a single action of the federal government as the inducing cause of the revocation of the plaintiff's charter. But to paraphrase the language of the Supreme Court in *Burton,* "in its [contract with U.S. Jaycees] the [Government] could have affirmatively required [the Jaycees] to discharge the responsibilities under the [Fifth] Amendment imposed upon the private enterprise as a consequence of state participation. But no State [federal government] may effectively abdicate its responsibilities by either ignoring them or by merely failing to discharge them whatever the motive

common usage refers to it as "state action." See McGlotten v. Connally, *supra,* 338 F. Supp. at 455 n. 31; Jackson v. The Statler Foundation, *supra,* 496 F.2d 627, n. 5.

29. Cf. Norwood v. Harrison, 413 U.S. 455, 463, 93 S.Ct. 2804, 2809, 37 L.Ed.2d 723 (1973): "That the Constitution may compel toleration of private discrimination in some circumstances does not mean that it requires state support for such discrimination."

30. We may conclude that this is the view of the Court of Appeals for the Second Circuit since Judges Moore and Anderson concurred with Judge Friendly in *Wahba, supra,* and Judges Mansfield and Oakes joined with Judge Smith in *Jackson, supra.* No judge of the Court has written to the contrary. Judge Mulligan expressed a similar view in Shirley v. State National Bank of Connecticut, 493 F.2d 739 (2 Cir. 1974).

may be." 365 U.S. at 725, 81 S.Ct. at 861.

I think here the federal government "has so far insinuated itself into a position of interdependence with [National] that it must be recognized as a joint participant in the challenged activity, which on that account, cannot be considered to have been so 'purely private' as to fall without the scope of the Fourteenth [Fifth] Amendment." *Id.*

"Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." *Burton, supra,* 365 U.S. at 722, 81 S.Ct. at 860.

"[T]he framework of the peculiar facts or circumstances present", 365 U.S. at 726, 81 S.Ct. at 862, are:

The Jaycees have changed in recent years from an organization largely devoted to advancement of the personal interest of its members in the business world to an organization largely devoted to good deeds. The U.S. Jaycees' literature emphasizes the role of the local chapters like the plaintiff in these projects. Many of these good deeds are the kinds of activity generally thought of as public functions. A simple recitation makes that evident: control of alcohol abuse, control of venereal disease, economic development, housing and recreation and criminal rehabilitation. In all these areas the Government has admitted civic organizations to partnership in implementing goals set by Congress. The function remains essentially public. The chapters participate in that function, as the literature of National attests.[31]

The funding for these particular public activities is largely governmental. The organization which receives the funds (National or Foundation) is subject to control by an Advisory Council on which sit representatives of four departments of the National Government. ". . . [E]ven indirect governmental participation in the management of an organization is persuasive evidence of the existence of 'state action' where that participation is both substantial and other than neutral." Jackson v. The Statler Foundation, *supra,* at 634.

Whether the federal funds are awarded by contract or grant, the federal government can and has imposed conditions on the grantee. Thus the O.E.O. grant has a condition prohibiting sex discrimination.[32] On the reasoning of *Burton,* by failing to enforce as a condition of the grant that the offending bylaws of National be nullified, the Federal Government would appear to the public to have approved discrimination based on sex in connection with the very activities funded in aid of the public function. "Encouragement of discrimination through the appearance of governmental approval may also be sufficient involvement to violate the Constitution." McGlotten v. Connally, *supra,* 338 F.Supp. at 458.[33]

The tax-exempt feature is only one other element to be considered. It is unnecessary, in view of the other elements that have led to the conclusion that "state action" is involved to rely upon the remand in Jackson v. The Statler Foundation, *supra,* as precedent for this decision.[34]

The testimony and exhibits establish the likelihood of irreparable injury to

---

31. "Jaycee voluntary manpower and concern for his community makes this program (ex-offender rehabilitation) work." "Jaycee chapters have constructed or are in the process of constructing over a quarter of a billion dollars in nonprofit housing." "Your chapter may develop . . . project ideas." "Each chapter should evaluate the needs of the young people in its community, then develop programs around those needs" etc. etc. (Ex. C Warfield Affd. Outlining Funding).

32. Roper Tr. 65.

33. The "symbolic tie with the state" need not be a sheriff's badge or a public building. Powe v. Miles, 407 F.2d 73 at 83 (2 Cir. 1968). The general public knows that the government uses the Jaycees to do some of its work and that they do not permit women to become members.

34. The defendant cites a recent opinion of the Court of Appeals of the Tenth Circuit, Junior Chamber of Commerce of Rochester,

Local should the revocation be permitted to become effective. In addition to the obvious loss of prestige by loss of affiliation, it also appears likely that there will be loss of funds for Local to carry out both its internal leadership and management programs, and its community oriented programs.[35]

I find that the plaintiff has met its heavy burden of demonstrating a combination of probable success and possibility of irreparable injury. The balance of hardships also tips in its favor. Stark v. New York Stock Exchange, Inc., 466 F.2d 743, 744 (2 Cir. 1972).

The foregoing shall constitute findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

The motion to quash is denied. The motion for a preliminary injunction is granted.

It is so ordered.

New York, et al. v. The United States Jaycees, 495 F.2d 883 (1974), in support of its position. In that case the claim was based largely on the tax-exempt status of the defendant United States Jaycees. The plaintiffs sought injunctions against government officials to prevent the making of grants for the use of the deprived and needy and to void the tax-exempt status of the United States Jaycees. Here the only relief sought is an injunction against the revocation of plaintiff's charter. To the extent that the opinion may be said to be a ruling on "state action," however, I note that the facts in that record are not clearly set forth. Moreover, if the record in the District Court in Oklahoma is substantially the same as that in this Court, then I must respectfully disagree with that part of the opinion.

35. Warfield Tr. 9–12; Washington Tr. 37, 40; Roper Tr. 66–67.