Louis **LOMBARDO** et al.,
Plaintiffs,

v.

Philip B. **HANDLER** et al.,
Defendants.

Civ. A. No. 74–431.

United States District Court,
District of Columbia.

July 28, 1975.

William H. Rodgers, Jr., Washington, D. C., for plaintiffs.

Calvin H. Cobb, Jr., Martin D. Schneiderman, John M. Edsall, Steptoe & Johnson, Washington, D. C., for defendants.

## MEMORANDUM OPINION AND ORDER

SIRICA, District Judge.

This matter comes before the Court on the parties' cross-motions for summary judgment. The motions were argued on April 21, 1975, at which time the Court took the matter under advisement.

The plaintiffs in this action are the Public Interest Campaign, a non-profit educational and charitable association with a special interest in the subject of air pollution, and the President of the Campaign, Louis Lombardo. They brought this suit to compel the defendants, the National Academy of Sciences, its Committee on Motor Vehicle Emissions (hereinafter C.M.V.E.), and several of the organizations' officials, to comply with the Federal Advisory Committee Act (hereinafter F.A.C.A.), 5 U.S.C. App. I (1975), and the Freedom of Information Act (hereinafter F.O.I.A.), 5 U.S.C. § 552 (1974). Plaintiffs contend that the closed-door deliberations of the Academy's C.M.V.E. are being conducted in violation of the law. On several occasions plaintiff Lombardo has sought unsuccessfully to gain access to the deliberations of the C.M.V.E. and its working papers. The defendants have taken the position that they are not subject to the Freedom of Information Act or the Ad-

visory Committee Act and, thus, they claim the right to keep the plaintiffs from attending their meetings, etc. The plaintiffs squarely challenge the defendants' claimed exclusion from the coverage of the statutes and ask the Court to declare that the Academy is an "agency" as that term is used in the statutes, and that the C.M.V.E. is an "advisory committee" within the meaning of the Advisory Committee Act. The parties concede and the Court agrees that there is no genuine issue of material fact to be litigated in this matter.

## I. IS THE ACADEMY AN "AGENCY" UNDER THE F.A.C.A.?

The plaintiffs' principal assertion is that the Academy is an "agency" as that term is used in the F.A.C.A.[1] and that the C.M.V.E. is an "advisory committee" of that "agency." The issue turns on whether the Academy is an "agency" within the meaning of section 3(3) of the F.A.C.A. That section provides that "agency" shall have the same meaning as under Section 2(a) of the Administrative Procedure Act (hereinafter A.P.A.), 5 U.S.C. § 551(1). There "agency" is defined (with exceptions not here relevant) to mean: "each authority of the Government of the United States, whether or not it is within or subject to review by another agency."

The plaintiffs have emphasized the numerous government connections of the Academy in arguing that it comes within the scope of that definition. Indicia of the "agency" status suggested by the plaintiffs include the fact that the Academy was established by Act of Congress.[2] It reports to Congress.[3] It is obligated to perform investigations, etc. for the departments of the federal government when so requested.[4] In

---

[1]. 5 U.S.C. App. I, § 3(3).

[2]. An Act to Incorporate the National Academy of Sciences signed by President Lincoln on March 3, 1863, 12 Stat. 806, 36 U.S.C. § 251 et seq.

[3]. 36 U.S.C. § 252. "The National Academy of Sciences shall have power . . . to report . . . to Congress." *Id.*

[4]. 36 U.S.C. § 253. "The National Academy of Sciences shall . . . whenever called upon by any department of the Government, investigate, examine, experiment, and report upon any subject of science or art . . . ." *Id.*

1914 Congress provided that "[T]he Congress may any time limit the amount of real estate which may be acquired and the length of time the same may be held by said National Academy of Sciences."[5] The principal operating arm of the Academy, the National Research Council, was the subject of two Executive Orders; Executive Order 2859 of May 11, 1918, which requested the Academy to perpetuate the Council, and Executive Order 10,668 of May 10, 1956, 3 C.F.R. 1954–1958 Comp., p. 323, in which the President apparently ordered certain general functions for the Council and decreed that government representatives on the Council should be appointed by department and agency heads.[6] The Academy is mentioned in several Acts of Congress which give some legal significance to reports or recommendations of the Academy.[7] Of particular relevance to this action is section 5 of the Clean Air Act Amendments of 1970 which requires the Administrator of the Environmental Protection Agency (E.P.A.) to undertake to enter into appropriate arrangements with the Academy to conduct studies regarding the feasibility of meeting certain emission standards,[8] and which provides that the 1975 auto emission standards cannot be suspended by the Administrator unless, *inter alia,* the Academy finds that it is not technically feasible to meet them.[9] And a very substantial portion of the Academy's income is derived from the federal government.[10]

The defendants respond with their own list of characteristics which distinguish the Academy from federal agencies. It is noted that prior to the Act of May 5, 1870, (Ch. 80 § 3, 16 Stat. 101 et seq.) Congress exercised exclusive authorization over all acts of incorporation in the District of Columbia. The Academy possesses none of the characteristic functions of an "agency"; i. e., rulemaking, adjudication, licensing, etc. The Academy does not receive (indeed is prohibited from receiving) government appropriations.[11] Rather, its relations with the government are of a contractual nature.[12] The Academy has no vested regulatory authority, has no power to implement its own advice, and lacks authority to impose any sanctions. The Academy also performs many functions for non-federal institutions, contracting with private foundations and

---

5. 36 U.S.C. § 254.

6. The mandatory language of this Executive Order is tempered somewhat by the absolute control which the Academy has over the degree of government representation on the Council. See section 2 of the Order, 3 C.F. R. 1954–1958 Comp., p. 323. Further, the defendants indicate that the practice outlined of government participation does not exist, and that only non-voting government liaison representatives now sit with the divisions of the N.R.C. See Supplemental Statement of Material Facts As To Which There Is No Issue, ¶ 53, filed November 8, 1974.

7. See, e. g., 42 U.S.C. § 3045e; 42 U.S.C. § 1857f–1; see also 7 U.S.C. § 136d; 21 U.S. C. § 376(b)(5)(C)–(D); 42 U.S.C. § 289l–2; see further 22 U.S.C. § 274a; 42 U.S.C. § 1881; 42 U.S.C. § 295h–8 note; 38 U.S.C. § 4101; 16 U.S.C. §§ 1401, 1403.

8. 42 U.S.C. § 1857f–1(c).

9. 42 U.S.C. § 1857f–1(b)(5)(C); see also Int'l Harvester Co. v. Ruckelshaus, 155 U. S.App.D.C. 411, 478 F.2d 615, 649 (1973).

10. The defendants acknowledge that approximately 75% of the Academy's revenues are derived from U. S. government contracts. Memorandum of Points and Authorities in Opposition To Plaintiffs' Motion for Summary Judgment, etc. filed November 8, 1974 at 4. In fiscal year 1974 this amounted to over $40,000,000 from the federal government, as compared to about $4,500,000 from non-federal contracts. See Supplemental Statement of Material Facts, ¶ 24, filed November 8, 1974.

11. See note 24, *infra.*

12. Despite the language of 36 U.S.C. § 253, *supra* at note 4, the defendants allege that on several occasions the Academy has declined to perform studies which the government has requested it to perform. See Supplemental Statement of Material Facts, ¶ 44, filed November 8, 1974. In several recent acts of Congress this flexibility has been provided by statute. See, e. g., 42 U. S.C. § 289l–2; 42 U.S.C. § 295h–8 note.

with state and local governments to perform various studies, etc. It is not subject to Civil Service employment controls, O.M.B. management controls, or G.A.O. accounting controls. It has never had free mailing privileges and does not have the right to publish materials in the *Federal Register*. In past years the Academy has been regarded by various cabinet officers and government officials as a private corporation, and not a part of the government.[13]

Whether, on balance, these characteristics give the Academy the status of an "agency" depends on the statutory description of "agency." The definition of "agency" given in the A.P.A. has been criticized as being "not very satisfactory." [14] However, reference to the legislative history has shown that:

> The theme that runs through the legislative history of section 2 is that an administrative agency is a part of government which is "generally independent in the exercise of [its] functions" and which "by law has authority to take final and binding action" affecting the rights and obligations of individuals, particularly by the characteristic procedures of rule-making and adjudication. Freedman, *Administrative Procedure and the Control of Foreign Direct Investment* 119 *U.Pa. L.Rev.* 1, 9 (1970).[15]

This definition has met with notable acceptance in the Courts. See, e. g., *Soucie v. David*, 145 U.S.App.D.C. 144, 448 F.2d 1067, 1073 (1971); *Grumman Aircraft Engineering Corp. v. Renegotiation Board*, 157 U.S.App.D.C. 121, 482 F.2d 710, 714, 715 (1973) (both cases emphasizing the "substantial independent authority" of the agency involved). Nevertheless, as recently noted in *Washington Research Project, Inc. v. Department of H. E. W.*, 504 F.2d 238 (D.C. Cir. 1974):

> [R]ecent cases have made it clear that any general definition [of agency] can be of only limited utility . . . .. The unavoidable fact is that each new arrangement must be examined anew and in its own context. *Id.* at 245, 246.

The Court of Appeals also noted in that case that:

> Employing consultants to improve the quality of the work that is done cannot elevate the consultants to the status of the agency for which they work unless they become the functional equivalent of the agency, making its decisions for it. *Id.* at 247, 248.

Starting at that point, this Court notes that the Academy cannot be said to be making decisions for the E.P.A. with regard to the Clean Air Act. The E.P.A. has clearly felt free to make its own decisions irrespective of the Academy's advice. See *Int'l Harvester Co. v. Ruckelshaus*, 155 U.S.App.D.C. 411, 478 F.2d 615, 624-628, 649 (1973). Nor can it be said that the Academy exercises substantial independent governmental authority. Indeed, the authority which the Academy does possess appears to rest on a respect for the qualifications of the members of the Academy rather than on any delegation of federal authority. The shadow of federal authority which may appear to cover the Academy while it works on government contracts cannot be said to be "independent authority" in any event. Rather, the Academy appears to rely on cooperating federal agencies for authority and assistance, as in the publication of notices by the *Federal Register*. Since the *Federal Register* only publishes for Federal agencies, the E.P.A. has sponsored the publication of notices for the Academy regarding the Clean Air Act Amendment study.

---

13. See Letter from Robert T. Lincoln to Gen. M. C. Meigs, October 11, 1884, attached as Exhibit 2 to the Affidavit of Jean St. Clair. See also Exhibits 4 & 5 to Affidavit of Jean St. Clair.

14. 1 K. Davis, Admin.Law Treatise, § 1.01 at 1 n. 1 (1958).

15. See also Washington Research Project, Inc. v. Department of H. E. W., 504 F.2d 238, 248, 249 n. 15 (D.C.Cir. 1974).

The fact that the Academy receives a great deal of federal money each year through government contracts may show that the Academy depends on the government for most of its business but it does not indicate that the Academy has "agency" status. The fact that Congress has repeatedly turned to the Academy when it feels it has a need for independent scientific judgment may indicate that Congressional partiality for the Academy exists, and the Executive Orders may even show some presidential favoritism for the Academy. But the Academy simply cannot be said to be a "center of gravity in the exercise of administrative power." [16] What the plaintiffs have not shown, and what the Court fails to perceive, is any significant delegation of governmental authority, jurisdiction, administrative function or power. The Academy may be an ally of the government, but it is not an "authority of the government of the United States." Thus, the plaintiffs' major contention, that the Academy is an "agency" for purposes of the F.A.C.A., must be rejected.

## II. IS THE C.M.V.E. AN "ADVISORY COMMITTEE"?

The plaintiffs have alternatively argued that the C.M.V.E. is an "advisory committee" under one of three other possible applications of the F.A.C.A. The term "advisory committee" is defined to mean:

any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof . . . which is—

(A) established by statute or reorganization plan, or

. . . . . .

(C) established or utilized by one or more agencies,

in the interest of obtaining advice or recommendations for the President or one or more agencies or officers of the Federal Government . . . . 5 U.S.C. App. I, § 3(2).

Plaintiffs argue that (1) the C.M.V.E. is a committee "established by statute," or (2) "established . . . by one or more agencies" (to wit, the E.P.A.), or (3) "utilized by one or more agencies" (again, the E.P.A.).

A. Was The C.M.V.E. Established By Statute?

Plaintiffs contend that the Clean Air Act Amendments of 1970 [17] which directed the Administrator of the E.P.A. to "undertake to enter into appropriate arrangements with the National Academy of Sciences to conduct a comprehensive study . . ." established the C.M.V.E. The plaintiffs allege that the statute, read with the Academy's enacting statute,[18] ordered the Academy to conduct a study; provided for public funding; required semiannual reports from the Academy and required cooperation by the E.P.A. Since the Academy traditionally creates committees to conduct its business, the creations of the C.M.V.E. under the statute was, plaintiffs argue, a foregone conclusion.

The argument overlooks the simple fact that nowhere in the statute is the C.M.V.E. or any other committee even mentioned. The language of the statute is directed to the E.P.A., and then it concerns the making of a contract to perform a scientific study, not the creation of an advisory committee. The plaintiffs may be correct in arguing that but for the legislation the C.M.V.E. would never have been created; however, that is not the relevant consideration under the statute. The term "established" does not include committees which merely can be said to owe their existence to legislation. A measure of more direct congressional creation must be shown before a committee is found to have been "established by statute" for purposes of the F.A.C.A.

---

16. Freedman, *Administrative Procedure and the Control of Foreign Direct Investment* 119 *U.Pa.L.Rev.* 1, 9 (1970).

17. See *supra*, notes 8 and 9.

18. See *supra*, note 4.

### B. Was The C.M.V.E. Established By The E.P.A.?

Plaintiffs similarly contend that the C.M.V.E. was "established" by the E.P.A. Again, reference is made to the Clean Air Act Amendment directing the E.P.A. Administrator to undertake to make appropriate arrangements for the study with the Academy, and the strong role played by the E.P.A. in determining what would be studied by the Academy is noted. However, it appears that the proposal to create a committee within the Academy to conduct the study originated with the Academy, not the E.P.A. See Letter from John S. Coleman, National Academy of Sciences Executive Officer, to Acting E.P.A. Commissioner Middleton, February 23, 1971; Exhibit B to Affidavit of James R. Wright, filed November 8, 1974. Moreover, the letter from John T. Middleton, Acting Commissioner of the Air Pollution Control Office of the E.P.A. to Academy President Handler, February 1, 1971, Exhibit A to Affidavit of James R. Wright, filed November 8, 1974, indicates that the E.P.A. was primarily concerned about the substance, scope and focus of the scientific study rather than with the internal organizational arrangements of the contractor performing the study. Strictly speaking, the C.M.V.E. was created by the Academy, not the E.P.A.

It appears that to accept plaintiffs' assertion on this point would require the Court to accept a much broader interpretation of the word "established" than Congress intended. It is true that the Senate Report on a proposed predecessor of the bill that became law recommended that "established" be given a liberal interpretation. S.Rep.No.92–1098, 92nd Cong., 2nd Sess. 8 (1972). But this concept was rejected by the Conference Committee and instead it expressed an intention to include only those committees "directly established" by an agency. Conf.Rep.No.92–1403, 92nd Cong., 2nd Sess. as reprinted in 1972 U.S.Code Cong. & Admin.News at p. 3509. The C.M.V.E. was not directly established by the E.P.A.; thus, plaintiffs' assertion that the C.M.V.E. is an "advisory committee" established by the E.P.A. must be rejected.

### C. Is The C.M.V.E. "Utilized" By The E.P.A.?

A review of the legislative history of the F.A.C.A. is necessary to determine whether the C.M.V.E. is being "utilized" by the E.P.A. so as to make it an "advisory committee" within the meaning of the statute.

The term "utilized" first appeared in the Act when the Conference Committee adopted the House definition of "advisory committee" with modifications. Previously neither H.R. 4383 nor S. 3529, the original bills approved by the House and Senate, contained the word. However, these bills drew heavily from Executive Orders 11007 and 11671 [19] which applied to certain advisory committees established by federal agencies as well as to certain committees not established by any federal agency but which were *utilized by a department or agency in the same manner as a Government-formed committee.* (Italics added.) The Conference Report does not specifically explain or define the intended meaning of the newly added term "utilized." However, the word and a synonym appear in the Reports explaining the predecessor bills in the House and Senate, and reference to the definitions of "advisory committee" contained in those bills is enlightening.

H.R. 4383, as approved by the House Committee on Government Operations, contained a definition of "advisory committee" which served as the basis for the definition adopted in the Act. In section 3(2) of that bill "advisory committee" was explained to mean:

any committee, board, commission, council, conference, panel, task force, or other similar group, or any sub-

---

19. Executive Order 11007, 27 Fed.Reg. 1875 (Feb. 26, 1962) and Executive Order 11671, 37 Fed.Reg. 11307 (June 5, 1972).

committee or other subgroup thereof . . . which is—

(a) established by statute or reorganization plan, or

(b) established by the President, or

(c) established by one . or more agencies,

in the interest of obtaining advice or recommendations for the President or one or more agencies . . . .

The Committee reporting the bill favorably compared it to the definition of "advisory committee" contained in Executive Order 11007 (taking special note of the distinctions), then went on to note:

The words "any committee established by the President . . . established by one . . . or more agencies" are meant to include those committees which may have been organized before their advice was sought by the President or any agency, but which are *used* by the President or any agency *in the same way as an advisory committee* formed by the President himself or an agency itself. H.R.Rep. No. 92–1017, 92nd Cong., 2nd Sess., as reprinted in 1972 U.S.Code Cong. and Admin.News at 3494. (Italics added.)

However, the Report noted:

The term advisory committee does not include any contractor or consultant hired by an officer or agency of the government, since such contractor would not be a "committee, board, commission, council . . . or similar group . . . ." *Id.*

S. 3529, the predecessor of the F.A.C.A. in the Senate, offered a different, somewhat broader, definition of "advisory committee." It included:

any committee, council, board, commission, task force, or other similar groups, or any subgroup thereof, which is established or organized under any statute or by the President or any officer of the government for the purpose of furnishing advice, recommendations, or information to any officer or agency, or to any officer or agency and to the Congress. . . . S.Rep. No. 92–1098, 92nd Cong., 2nd Sess. 6–7 (1972).

In elaborating on this definition, the Senate Committee explained:

What kind of committees would this bring into coverage under the legislation? The intention is to interpret the words "established" and "organized" in their most liberal sense, so that when an officer brings together a group by formal or informal means, *by contract or other arrangement,* and whether or not Federal money is expended, to obtain advice and information, such group is covered by the provisions of this bill. Examples of such groups are the . . . *committees of the National Academies where they are utilized and officially recognized as advisory to the President, to an agency, or to a Government official. Id.* at 8. (Italics added.)

Thus, the bill that originally passed the House covered committees which were "used" by an agency as advisory committees but was specifically intended to not include contractors, while the bill that passed the Senate specifically was meant to include contractors like the committees of the Academy when they were used as advisory units. The House and Senate bills, along with their Reports, went to a conference committee. The substitute bill that came from the conference committee and which ultimately became law "adopt[ed] the House definition of 'advisory committee' with modification." Conf.Rep. No. 92–1403, 92nd Cong., 2nd Sess., as reprinted in 1972 U.S.Code Cong. and Admin. News at 3509.

The conference substitute definition of "advisory committee" includes committees which are established *or utilized* by the President or by one or more agencies or officers of the Federal Government. *Id.*

Under the heading "Applicability of the Provisions of the Act" the conference report noted:

> The Act does not apply to persons or organizations which have contractual relationships with Federal agencies nor to advisory committees not directly established by or for such agencies. *Id.*

Thus, the conferees specifically rejected the Senate's intention to extend the coverage of the Act to groups presenting advice and recommendations to federal agencies under contract.

When the conference bill returned to the House of Representatives for final discussion and passage, the Senior House Conferee and Chairman of the House Committee on Government Operations, Congressman Holifield, was asked by a colleague:

> Mr. Horton. Am I correct in the understanding that this bill does not apply to such organizations as the National Academy of Sciences and its various committees which make studies and submit reports to Federal agencies on request?

Mr. Holifield replied:

> The gentleman is quite correct. If he will refer to the joint explanatory

statement of the committee of the conference at page 10, the first full paragraph, it states as follows:

> The Act does not apply to persons or organizations which have contractual relationships with the Federal agencies nor to advisory committees not directly established by or for such agencies.

As the gentleman knows, the National Academy of Sciences was founded by Congress, and, therefore, it comes under that category. Mr. Horton. So it would be excluded? Mr. Holifield. That is correct. 118 Cong.Rec. 31421 (1972).

Finally, worthy of further mention is an incident that occurred some time after the F.A.C.A. had been adopted. At an oversight hearing before the subcommittee of the Senate Committee on Government Operations which had written the Senate's predecessor bill to the F.A.C.A., the counsel to the subcommittee expressed his opinion that the Academy, when working under contract for federal agencies, was not subject to the F.A.C. A.[20]

The F.A.C.A has been interpreted but a few times since it was enacted. No court has yet specifically reviewed or interpreted the language here disputed in

---

20. See Hearings on Advisory Committee Act Oversight Before the Subcommittee on Budgeting, Management and Expenditures of the Senate Committee on Government Operations, 93rd Cong., 1st and 2nd Sess., 88–89 (1973–74). The dialogue between the witness, Mr. Rodgers, and the committee counsel, Mr. Turner, indicated:

> *Mr. Rodgers.* Yes, . . . The National Academy of Sciences is a group that argues it is entirely exempt from the act. There is some legislative history for that, but I think a strong case can be made that the Academy's committees should be covered.
>
> Quite obviously, the committees of the National Academy are heavy policy makers.
>
> *Mr. Turner.* On that particular point, as to the Academy, because I happened to be around when some of that legislative history was taking place it was generally ac-

cepted as legislative intent at the Conference on the Advisory Committee Act that the National Academy of Sciences, when it meets as a group down the street to discuss things within itself and to develop whatever reports come to it, is in no different a category than the National Association of Manufacturers or the U. S. Chambers of Commerce. It is a private organization talking to itself. But when the National Academy of Sciences, by a contractual relationship, advises the Federal Government, it is in the capacity of a consultant, and subject to appropriate laws, not the Federal Advisory Committee Act.

If it advises the Federal Government directly in any other way, it is covered under the Federal Advisory Committee Act. It is clear in legislative history and it was made very clear to Mr. Handler. . . . *Id.*

light of its legislative history.[21] The Office of Legal Counsel of the Department of Justice has given its opinion on this point raised in a strikingly similar context. It suggested that a committee of the Academy was not an "advisory committee" because it was not directly utilized by the federal agency which had contracted for a certain study with the Academy.[22]

In light of all of the above, it is appropriate for the Court to note the following: First, that, in the words of Judge Gesell of this district, from "the very vagueness and sweeping character of the definition" of an advisory committee "[i]t is apparent that the Act contains a very broad, imprecise definition, and in this respect is not a model of draftsmanship." *Nader v. Baroody,* C.A. No. 74–1675, 396 F.Supp. 1231 at 1232 (D.D.C.1975). Second, the legislative history of the F.A.C.A. evidences an apparent intention on the part of Congress to exclude from the coverage of the Act generally groups providing advice to federal agencies pursuant to a contractual relationship, and specifically the

committees of the National Academy of Sciences when so doing.

This is a sufficient basis for decision on this point, for whatever else the ambiguous term "utilized" might mean and however else that term might be interpreted, it is reasonably clear to the Court from the legislative history that Congress did not intend for F.A.C.A. to cover the C.M.V.E. Furthermore, from a review of the relationship between the E.P.A. and the Academy and from an examination of the report-review procedures involving the Academy and the C. M.V.E. it appears that the E.P.A. is "utilizing" the Academy itself, and not the C.M.V.E.[23] Thus, the plaintiffs' contention that the C.M.V.E. is an "advisory committee" "utilized" by the E. P.A. must be rejected.

## III. DOES THE F.O.I.A. DEFINITION OF "AGENCY" COVER THE ACADEMY?

During the pendency of this litigation amendments to the Freedom of Information Act were enacted which included an amended definition of "agency."[24]

21. *But see Food Chemical News, Inc. v. Davis,* 378 F.Supp. 1048 (D.D.C.1974); compare *Aviation Consumer Action Project v. Yohe,* C.A. No. 707–73 (D.D.C. June 24, 1974). *See also Nader v. Baroody,* C.A. No. 74–1675. 396 F.Supp. 1231 (D.D.C.1975) for a valuable general review of the term "advisory committee."

22. In a letter dated November 27, 1973 (Exhibit I to Affidavit of John S. Coleman filed November 8, 1974) Mr. Robert G. Dixon, Jr. of the Office of Legal Counsel responded to a query from the F.D.A.'s General Counsel Office regarding the applicability of the F. A.C.A. provisions to a committee of the Academy which was conducting scientific research on the safety of saccharin for the F. D.A. under an F.D.A.-Academy contract. The question focused on whether the committee of the Academy was being "utilized" by the agency. While noting that the legislative history evidenced a general intent to exclude committees of the Academy from the coverage of the F.A.C.A., the Department of Justice could not conclude that the mere existence of a contract automatically removed a committee of the Academy from coverage of the Act. Rather, the "substance of the

relationship" between an agency and a contractor was identified as the controlling element. Focusing on the significant review procedures by which the Academy exercised control over the reports of its committee which would be sent to the agency, the Department of Justice concluded that the F.D. A. was utilizing the Academy itself, and not the committee of the Academy and, thus, the committee was not an "advisory committee." The letter repeatedly cites certain guidelines propounded by the OMB/Department of Justice which included extensive interpretation of the F.A.C.A. 38 Fed.Reg. 2306 (January 23, 1973). (See especially paragraph 4.) However, this publication was rescinded and superseded by the O.M.B. Circular No. A–63 Rev. published at 39 Fed.Reg. 12389 (April 5, 1974). The latter publication contains none of the legal/interpretative language that was in the earlier publication.

23. See *supra,* note 21, and accompanying text. See Supplemental Statement of Material Facts, ¶¶ 34–37, 102–126, filed November 8, 1974.

24. Pub.L. 93–502, November 21, 1974, 88 Stat. 1561, 5 U.S.C. § 552(e). The Act was vetoed by the President on October 17, 1974,

Thus, for purposes of considering the plaintiffs' claim under the F.O.I.A. the question of whether the Academy is covered by the amended definition of "agency" must be considered.

Under the 1974 F.O.I.A. Amendment, the definition of "agency" has been expanded to include

any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency. 5 U.S.C. § 552(e).

Plaintiffs argue that the Academy is within this definition on three counts —as a government corporation, as a government controlled corporation, and as an "other establishment in the executive branch of the Government."

To test these allegations reference must be made to the legislative history of the F.O.I.A. Amendment. The Senate predecessor of the 1974 Amendments defined "agency" to include, in addition to units covered by the A.P.A. definition, "the United States Postal Service, the Postal Rate Commission, and any other authority of the Government of the United States which is a corporation and which receives any appropriated funds." S. 2543, S.Rep. No. 93–854, 93rd Cong., 2nd Sess. 43 (1974). The Senate Committee Report approvingly reviewed the *Soucie* interpretation of the A.P.A.'s definition of agency ("any administrative unit with substantial independent authority in the exercise of specific functions") but noted that the U. S. Postal Service had taken the position that without specific inclusionary language, amendments to the F.O.I.A. would not apply to it. Hence,

[t]o assure the F.O.I.A. application to the Postal Service and also to include

publicly funded corporations established under the authority of the United States, like the National Railroad Passenger Corporation (45 U.S.C. § 541) section 3 incorporates an expanded definition of agency to apply under the F.O.I.A. *Id.* at 35.

The House predecessor of the Freedom of Information Act Amendments included the definition which was ultimately included in the legislation. See H.R. 12471, H.R.Rep. No. 93–876, 93rd Cong., 2nd Sess. 29 (1974), U.S.Code Cong. & Admin.News 1974, p. 6267. The House Report on this bill noted that:

for the purposes of this section, the definition of "agency" has been expanded to include those entities which may not be considered agencies under section 551(1) of title 5, U.S.Code, but which perform governmental functions and control information of interest to the public. *Id.* at 8, U.S.Code Cong. & Admin.News 1974, at p. 6274.

The term "government corporations" was meant to include a corporation that is a wholly government-owned enterprise . . . ." ,The term "Government controlled corporation" "would include a corporation which is *not* owned by the Federal Government, such as the National Railroad Passenger Corporation (Amtrak) and the Corporation for Public Broadcasting." *Id.* at 8, 9, U.S.Code Cong. & Admin.News 1974, at p. 6274.

When the two bills went to the Conference Committee and a substitute bill was worked out, the House bill's definition of "agency" was followed. The Conference Report explained:

The conferees state that they intend *to include within the definition of* "agency" those entities encompassed by 5 U.S.C. § 551 and other entities including the United States Postal Service, the Postal Rate Commission,

but Congress overrode the veto on November 21, 1974, and the amendments took effect ninety days later. See generally Freedom of Information Act and Amendments of

1974, Source Book: Legislative History, Texts and Other Documents, Joint Committee Print, 94th Cong. 1st Sess., U. S. Government Printing Office (March, 1975).

and government corporations or government-controlled corporations now in existence or which may be created in the future. They do not intend to include corporations which receive appropriated funds but are neither chartered by the Federal Government nor controlled by it, such as the Corporation for Public Broadcasting. H.R. Rep. No. 93–1380, 93rd Cong., 2nd Sess., 13, 14 (1974).

■ Based on this review of the legislative history the Court finds that the Academy is not an "agency" under the 1974 Amendments to the F.O.I.A. Clearly, it is not an "establishment in the executive branch of the Government," for it neither functions under the President nor was it created by Congress or the President. See H.R.Rep. No. 93–876, 93rd Cong., 2nd Sess. 8 (1974). Nor is it a "Government corporation" for it is not a "wholly Government-owned enterprise." *Id.* Finally, it is not a "Government controlled corporation" for no significant control by the federal government has been shown. It is not an "authority" of the government (Senate Report, *supra)* nor does it perform "governmental functions" (House *Report, supra)* like an administrative agency.

■ The Academy compiles information while conducting studies pursuant to contractual agreements with federal agencies. This is not comparable to the assembling and maintenance of information as an adjunct to performing specific governmental (administrative) functions. Upon transmittal to the agency for which an investigation or study is conducted the reports of the Academy are available under the provisions of the F.O.I.A. It is true that the Academy is paid for the work it does for the government from "appropriated funds." [25] Yet it is not a "publicly funded" institution. It was chartered by Congress. Yet its charter, dating to an era when Congress did all the incorporating for the District of Columbia, is simply not comparable to the federal charters of the government corporations or government controlled corporations specifically mentioned in the legislative history as objects of the amendment.[26] The strength of the F.O.I.A. is the concept of public accountability for the operation of federal agencies. It was not intended to be applied directly to private entities which merely contract with the government to conduct studies. Thus, the Court concludes ánd finds that the Academy is not covered by the 1974 Amendments to the F.O.I.A.

## IV. ORDER

Therefore, it is by the Court this 28th day of July, 1975,

Ordered that the Motion of the Plaintiffs for Summary Judgment be, and the same hereby is, denied in all respects; and it is

Further ordered that the Cross-Motion of the Defendants for Summary Judgment be, and the same hereby is, granted.

25. "The National Academy of Sciences shall . . . be paid from appropriations which may be made for the purpose, but the academy shall receive no compensation whatever for any services to the Government of the United States." 36 U.S.C. § 253. See note 4, *supra,* and accompanying text.

26. See, e. g., H.R.Rep.No.93–876, 93rd Cong., 2nd Sess. 8 (1974); compare Conference Report, H.R.Rep.No.93–1380, 93rd Cong., 2nd Sess., 13, 14 (1974).