**CIBA–GEIGY CORPORATION, Plaintiff,**

v.

**David MATHEWS, in his capacity as Secretary of the Department of Health, Education, and Welfare, et al., Defendants.**

**No. 75 Civ. 5049 (CHT).**

United States District Court,
S. D. New York.

March 8, 1977.

Davis, Polk & Wardwell, New York City, for plaintiff; Daniel F. Kolb, New York City, of counsel.

Daniel R. Murdock, Acting U.S. Atty., S.D.N.Y., New York City, for Federal Government defendants; Naomi Reice Buchwald, Asst. U.S. Atty., New York City, Stuart M. Pape, Dept. of Health, Education and Welfare, Washington, D.C., of counsel.

Francis B. Burch, Atty. Gen. of Maryland, Baltimore, Md., for defendants University of Maryland and Dr. Christian R. Klimt; David H. Feldman, Mary Elizabeth Kurz, Asst. Attys. Gen., Baltimore, Md., of counsel.

## MEMORANDUM

TENNEY, District Judge.

This dispute involves plaintiff's request for the production of a substantial amount of data and materials pursuant to the Freedom of Information Act, 5 U.S.C. § 522 ("FOIA" or "the Act"). Plaintiff is the CIBA–GEIGY Corporation, a manufacturer of pharmaceuticals including phenformin, an oral hypoglycemic drug used to lower the blood glucose levels in patients with maturity-onset diabetes mellitus. Defendants named in this action are the Secretary of Health, Education and Welfare ("HEW"); the National Institutes of Health ("NIH"), which is a division of the Public Health Service of HEW; and the Commissioner of the Food and Drug Administration ("FDA"), an administrative

agency within HEW. (These three defendants are collectively referred to hereinafter as the "federal defendants"). Also named are Dr. Christian Klimt ("Klimt"), as coordinator of the University Group Diabetes Program ("UGDP"), and the University of Maryland (the "research defendants"). Plaintiff has moved for an order compelling production of "agency records" for purposes of inspection and copying. Federal defendants have moved under Rule 12(b) of the Federal Rules of Civil Procedure ("Rules") to dismiss the complaint or, in the alternative, for summary judgment in their favor pursuant to Rule 56. Research defendants have also moved to dismiss the complaint and to quash the service of process. For the reasons stated below, the plaintiff's motion is denied, and the federal defendants' motions are granted to the extent set forth herein. The research defendants' motions are denied as moot.

An explanation of the underlying factual circumstances is necessary. In mid-1959 scientists at various university medical research clinics throughout the United States conceived a study which had as one of its objectives the evaluation of the efficacy of various hypoglycemic treatments in the prevention of vascular complications in patients with mild diabetes. To finance their research, these private parties applied for federal grants from the National Institute of Arthritis, Metabolism and Digestive Diseases ("NIAMDD"), one of the institutes of NIH. Grants were awarded to six university clinics in addition to the coordinating center at the University of Maryland, where Dr. Klimt was the principal investigator. Each submitted a separate grant application. Subsequently, six additional universities became involved in the study, and each also received an individual grant. The clinics involved in the UGDP study began their research in 1961. Test results from each medical clinic were sent to the UGDP coordinating center where all the data was collected and recorded. (Complaint ¶ 10).

The study focused on the relationship between the control of blood sugar in patients suffering from maturity-onset diabetes and the development of complications from that disease. Defendants contend that the UGDP's goal was a general expansion of knowledge and not the testing of a hypothesis that one form of treatment caused greater cardiovascular complications than another, and that the UGDP did not have a particular regulatory impact in mind. (Whedon Affidavit ¶ 4). It appears that the raw data assembled from the study consists of millions of documents involving over 1,000 patients examined since the study commenced in 1961. (*Id.* ¶ 9).

The terms of the grant applications provided that the "raw data generated by the UGDP study at the 12 clinics are the property of the individual investigators and the coordinating center" (Dickson Affidavit ¶ 3), that the investigators would retain the right to publish the results provided that any such publication acknowledge the support of the grants, and that the responsibility lay with the individual grantees for "[m]anagement of the day-to-day operations of grant-supported activities." (Whedon Affidavit ¶ 9). Although NIH has access to the raw data generated by funded projects under 45 C.F.R. § 74.23, it customarily relies solely upon the interim and final reports which must be submitted to it under 45 C.F.R. §§ 74.80, 74.82 (Whedon Affidavit ¶ 9 and Exhibits 2 and 3 thereto).

The FDA was not initially involved in the UGDP study. However, when the UGDP reported results indicating a significantly higher mortality apparently due to cardiovascular causes for patients being treated with oral hypoglycemic drugs, and in 1967 voluntarily submitted these findings in report form to the FDA, the FDA decided to become involved. In 1970, the FDA convened an ad hoc expert committee to consider the UGDP findings and their possible regulatory significance. It reviewed the results of the UGDP study and in addition obtained the opinions of other experts in the fields of diabetes treatment and pharmacology as well as the assessment of the Biometrics Society, an organization of bio-

statisticians independently retained by the FDA to review the UGDP study.[1] On these bases, the FDA concluded that a warning in the labeling of oral hypoglycemic drugs was necessary to inform physicians of the ostensibly increased risk of cardiovascular complications arising from treatment with such drugs as compared to treatment with diet alone or diet plus insulin. (Crout Affidavit ¶¶ 6–9).[2]

In July 1975 the FDA proposed revised labeling requirements and at the same time solicited comments from interested persons. An announcement was printed in the Federal Register that an informal public hearing would be held to receive additional data and information on the proposed labeling requirement.[3] (40 Fed.Reg. 28587 (July 7, 1975); Crout Affidavit ¶ 12 and Exhibit 3 thereto).

Plaintiff challenges the manner in which the UGDP raw data was handled at the UGDP coordinating center and consequently questions the accuracy of the results reported. Accordingly plaintiff instituted this action pursuant to the FOIA to obtain access to the data underlying the UGDP reports, claiming that such data constitutes agency records within the purview of the Administrative Procedure Act. 5 U.S.C. §§ 551(1) *et seq.* Plaintiff contends that the UGDP is de facto a federal agency and that its records are therefore agency records. Plaintiff further contends that even if the UGDP is not a federal agency in itself, it nevertheless served as an extension of a federal agency. Plaintiff also justifies its action against the University of Maryland on the theory that the university, acting as the UGDP coordinating center, maintains custody of the above mentioned Government records. All defendants dispute that the UGDP is a federal agency and that its underlying records are Government or agency records.

The FOIA grants a district court jurisdiction to "enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B). The Act is directed at Government agencies and enables the court to compel an agency to release its records. *Soucie v. David,* 145 U.S.App.D.C. 144, 448 F.2d 1067 (1971) ("*Soucie* "). If the UGDP is such an agency, then it is obligated to release any non-exempt records requested by plaintiff. If the UGDP is not a federal agency, plaintiff contends that disclosure of its records may still be compelled if those records can be characterized as Government agency records. *Cf. Nichols v. United States,* 325 F.Supp. 130, 137 (D.Kan. 1971), *aff'd,* 460 F.2d 671 (10th Cir. 1972), *cert. denied,* 409 U.S. 966, 93 S.Ct. 268, 34 L.Ed.2d 232 (1972) ("*Nichols* "). If the Court neither finds that the UGDP is a Government agency nor accepts plaintiff's construction of the UGDP records as Government agency records, then it is without power to grant plaintiff's request under the FOIA for relief in this action.

### The UGDP is Not an "Agency"

Courts analyzing the "agency" status of various organizational entities under

---

1. The FDA had awarded a contract to the Biometrics Society, an outside entity and an "international organization of biostatisticians," to make a comprehensive assessment of the UGDP study. The Biometrics Society "consider[ed] the evidence of harmfulness [of oral hypoglycemics] moderately strong" and concluded that the research "raised suspicions that cannot be dismissed on the basis of other evidence presently available." 40 Fed.Reg. 28590 (July 7, 1975).

2. Phenformin is available only to patients with physicians' prescriptions. The proposed labeling would reach physicians and pharmacists. For a detailed discussion of the controversy surrounding the UGDP study, *see Bradley v. Weinberger,* 483 F.2d 410 (1st Cir. 1973), which vacated a restraining order sought by a group of physicians enjoining the FDA from requiring manufacturers to include an unencumbered warning of associated cardiovascular hazards in the labels for oral hypoglycemic drugs. *See* 40 Fed.Reg. 28587 (July 7, 1975).

3. It may be noted that such a hearing was not required under 21 U.S.C. § 371(a) since it was merely a proposal for a regulation and not a final order that was formulated. *National Nutritional Foods Ass'n v. Weinberger,* 512 F.2d 688, 699–700 (2d Cir. 1975).

the FOIA have not applied a precise standard but have adopted a functional analysis, examining numerous factors including whether the organization has the authority in law to perform the decisionmaking functions of a federal agency and whether its organizational structure and daily operations are subject to substantial federal control.

In *Soucie, supra,* the United States Court of Appeals for the District of Columbia Circuit examined a congressionally created executive office which, in addition to advising the President, performed the legislatively delegated investigatory function of "evaluating federal programs." 448 F.2d at 1075. Utilizing the standard that an administrative unit must have "substantial independent authority in the exercise of specific functions," *id.* at 1073, the court found the unit to be an agency within the meaning of the FOIA. Unlike the entity in *Soucie,* the UGDP has no independent authority to perform specific Governmental functions.

■ In *Washington Research Project, Inc. v. HEW,* 164 U.S.App.D.C. 169, 504 F.2d 238 (1974), *cert. denied,* 421 U.S. 963, 95 S.Ct. 1951, 44 L.Ed.2d 450 (1975) (*"Washington Research"*), the court considered the nature of outside private consultants appointed by the National Institute for Mental Health ("NIMH"), a subdivision of HEW, to independently review applications for NIMH grants. The consultants did extensive evaluations and reported their findings and recommendations to the federal agency. The recommendations were "an often crucial element in the approval process" since they were generally adopted by the agency after only a perfunctory review. *Id.* at 248. In denying agency status, the court held that "the degree of scrutiny [the consultants'] decisions are given on review is . . . beside the point. . . . The important consideration is whether it has any authority in law to make decisions." *Id.* Only if the agency automatically adopts the organization's decision as its own can it be considered a functional equivalent of the agency and achieve for itself the status of a federal agency under the FOIA. *Id.* Like the review group of consultants in *Washington Research,* the UGDP researchers and the coordinating center in this case have no independent legal authority to make decisions for the FDA or HEW.

In *Rocap v. Indiek,* 176 U.S.App.D.C. 172, 539 F.2d 174 (1976), the court considered whether the Federal Home Loan Mortgage Corporation ("FHLMC") would be deemed an agency for purposes of the FOIA within the expanded definition of section 552(e), which provides that

"the term 'agency' as defined in Section 551(1) of this title includes any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government . . . , or any independent regulatory agency." 5 U.S.C. § 552(e), as amended by Pub.L. No. 93–502, 88 Stat. 1561 (1974).

Plaintiff argued that the FHLMC was a "government controlled corporation" subject to the reporting and disclosure requirements of the FOIA. The court reiterated its earlier theme that there was no one determinative characteristic. It observed that the corporation was "subject to . . . substantial federal control over its day-to-day operations," *id.* at 177, and concluded that it was an agency.

"The organizational structure of the Corporation exhibits many characteristics similar to those of other governmental entities subject to the Freedom of Information Act. It is federally chartered, its Board of Directors is Presidentially appointed, it is subject to close governmental supervision and control over its business transactions, and to federal audit and reporting requirements. In addition, the Corporation is expressly designated an 'agency,' and its employees are officers and employees of the United States, for a number of purposes. Like other agencies, it is empowered 'to make and enforce such bylaws, rules, and regulations as may be necessary or appropriate to carry out the purposes or provisions of

[its enabling act].' 12 U.S.C. § 1452(b)(3)." *Id.* at 180.

Unlike the FHLMC, the UGDP project was privately conceived and organized, and its regular operations were not subject to substantial federal supervision.

Finally, in *Wolfe v. Weinberger,* 403 F. Supp. 238 (D.D.C.1975) ("*Wolfe*"), the district court was called upon to determine whether transcripts of an FDA advisory review panel, turned over to HEW, had to be released to the public under the FOIA. The defendants contended that the transcripts fell within exemption five of the Act, 5 U.S.C. § 552(b)(5), which protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." The court first considered whether the panel constituted an agency within the Act, and then examined its role in relation to general FDA regulatory functions. FDA panels are commonly appointed to receive and evaluate information and to solicit submissions of the views of all interested parties. Private discussions about the information are recorded in transcripts. The panel then submits its conclusions and recommendations to the Commissioner of the FDA, who reviews the report and formulates proposed regulations, sometimes merely adopting the report *in toto. Id.* at 241. The court recognized that the panel in this case performed a crucial role in the decisionmaking process but nevertheless concluded that it was not an agency since it was authorized only to make recommendations and not decisions. Since the ultimate decisionmaking authority lay with the FDA, the degree of scrutiny given the report was held irrelevant to determining whether the panel served as an agency. *Id.* Like the panel in *Wolfe,* the UGDP is empowered only to make recommendations. *Cf. Lombardo v. Handler,* 397 F.Supp. 792, 796 (D.D.C.1975).

This court finds that the degree of Government involvement and control in the operations of the UGDP was insufficient as a matter of law to hold that the UGDP constituted an agency for purposes of the FOIA. The university researchers were private parties and individual recipients of NIH grants. Although publicly funded, their coordinated project originated privately as a scientific venture and did not perform a regular federal function, such as that delegated by Congress to an administrative agency. It was subject to federal audit but not to federal supervision of its daily operations. It voluntarily presented its conclusions and findings to the FDA but had no "authority in law" to make the decisions for the agency. In other words, the UGDP did not substitute in form or in authority for an administrative agency.

*The Underlying Data of the UGDP Study Does Not Constitute "Agency Records"*

■ Plaintiff contends that even if the UGDP is not an agency, its records and compilation of data are tantamount to agency records subject to disclosure since the UGDP served as an extension of a Government agency. In support of this contention plaintiff focuses on three attributes of the UGDP study which allegedly vest it with federal governmental character—federal funding of the research, federal access to its data and federal reliance upon its results. Since the UGDP study was funded by an arm of NIH, which is itself a division of HEW, plaintiff posits a principle that "ownership of work performed at Government expense lies with the Government," and therefore that all papers and materials relating to the federally financed research project should be deemed agency records. (Memorandum in Support of Plaintiff's Motion to Compel Disclosure of Agency Records at 29). Plaintiff further contends that because HEW, NIH and the FDA have access to the data by virtue of HEW regulations, the data is under the control of those agencies. (*Id.* at 33–34). Finally, plaintiff urges that since the FDA relied upon the UGDP reports in proposing labeling regulations, it necessarily relied upon the data underlying the reports and therefore that such data constitutes records of the FDA. (*Id.* at 25–28).

There is little official authority to aid the Court in discerning whether documents are agency records. *See SDC Development Corp. v. Mathews,* 542 F.2d 1116, 1118 (9th Cir. 1976); *Nichols, supra.* The statutory scheme does not define the essential attributes of agency records but merely enumerates examples of the type of information to be made available to the public. These include, *inter alia,* descriptions of agency organization and procedure, substantive policy statements, final opinions and orders along with official agency interpretations. *See* 5 U.S.C. § 552(a). Similarly, the General Services Administration ("GSA") has adopted a working definition of official records to implement the FOIA. 41 C.F.R. § 105–60.101. The definition provides as follows:

> "The term 'records' means all books, papers, maps, photographs, or other documentary materials, regardless of physical form or characteristics, *made or received* by GSA in pursuance of Federal law or in connection with the transaction of public business and preserved or appropriate for preservation as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of GSA or because of the informational value of data contained therein." *Id.* § 105–60.103 (emphasis added).

This definition seems to presume that to be a Government "record" the material must either be the property of the Government or be subject to significant Government control, and focuses on its physical nature and relevant contents. The terms "in connection with the transaction of public business" and "appropriate for preservation as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of GSA" are apposite to the FOIA inquiry.

In this context it is helpful to remember the purposes and policies sought to be effectuated by the FOIA. Congress intended the FOIA to provide public access to information dealing with the structure, operation and decisionmaking functions of Government agencies and to prevent these agencies from cloaking their actions in secrecy.[4] Implicitly, the FOIA's purpose of disclosing Government agency records reaches only those records which are owned or controlled by the Government agency and thus used in the performance of its public business.

In evaluating whether these records are agency records, this Court holds that the goals and purposes of the Act would be served best by imposing a standard which calls for proof that the records were either Government-owned or subject to substantial Government control or use. In other words, it must appear that there was significant Government involvement with the records themselves in order to deem them agency records.

Absent the guidance of direct legislative or judicial authority, the Court will focus its evaluation of Government involvement with the UGDP data on the elements noted by plaintiff. Plaintiff suggests that the existence of Government funding, access and reliance is strongly indicative of the federal character of the data. To the extent that these factors are present in this case, they are insufficient to meet this Court's standard of substantial Government control, use or involvement with the UGDP records.

The UGDP research project was funded by a grant from NIH's NIAMDD, which operates under congressional authority to support private research efforts as well as

---

**4.** The Act purports "to open agency action to the light of public scrutiny," *Rose v. Dep't of Air Force,* 425 U.S. 352, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976), and repeatedly instructs "that *official information* shall be made available 'to the public,' 'for public inspection.'" *Id.* at 361, 96 S.Ct. at 1599, *quoting from Environmental Protection Agency v. Mink,* 410 U.S. 73, 79, 93 S.Ct. 827, 35 L.Ed.2d 199 (1973) (empha-sis added). It "seeks to permit access to *official information* long shielded unnecessarily from public view and attempts to create a judicially enforceable public right to secure such information from possibly unwilling official hands." *Environmental Protection Agency v. Mink,* 410 U.S. at 80, 93 S.Ct. at 832 (emphasis added).

to conduct its own research in specific fields. 42 U.S.C. § 289c–1(c). Despite the existence of federal funding, the Court finds that the UGDP was not doing the research of NIH·in this instance, but, as a recipient of statutory grants from NIH, was conducting its own private scientific studies.[5] (*See* Whedon Affidavit ¶ 4).

■ Nor will the amount of federal funding of a research project determine the character of the work produced.[6] In *Lombardo v. Handler, supra,* the court held that substantial federal funding failed to make the National Academy of Sciences ("Academy") subject to the strictures of the FOIA. The Academy, a congressionally created entity, was in regular receipt of federal appropriations. It generally served to compile information with respect to scientific studies conducted pursuant to contracts with federal agencies. The court concluded that the Academy, despite its numerous federal connections and large amounts of federal appropriations, was not "controlled" by the Government and that its information-gathering research was

> "not comparable to the assembling and maintenance of information as an adjunct to performing specific governmental (administrative) functions. Upon transmit-

tal to the agency for which an investigation or study is conducted the reports of the Academy are available under the provisions of the F.O.I.A. . . . The strength.of the F.O.I.A. is the concept of public accountability for the operation of federal agencies. It was not intended to be applied directly to private entities which merely contract with the government to conduct studies." *Id.* at 802.

This Court agrees that federal funding, regardless of amount, is not sufficient to vest the underlying raw data of the UGDP research with a public character. To hold otherwise at a time when public monies flow to numerous private endeavors would surely have a chilling effect on independent efforts at research and development by all but those institutions able to survive without Government support.[7]

The second and third factors raised by plaintiff—Government access to and reliance upon information—likewise will not signify Government ownership or control of such information. The Court is convinced that the data in question was intended to be and is essentially *private* material. Although the federal defendants have access to the underlying data, there is no evidence that they have used it to exercise regular

---

5. The effect of an NIH grant on the status of a party was examined by this circuit in rejecting federal jurisdiction over a dispute which arose when an NIH grantee fired a grant participant. *Wahba v. New York University,* 492 F.2d 96 (2d Cir. 1974) ("*Wahba*"). In *Wahba* the court concluded that NIH funding would not transform an essentially private research effort into public activity in order to justify federal court intervention and observed:

> "This kind of arrangement, whereby federal funds are used to prime the pump of research effort in private scientific institutions which the Government could not perform as well, has social values too obvious to require elaboration. Only rarely are professors of Dr. Ochoa's eminence willing to enter government service in peacetime. It is equally clear that scientists of his reputation on the staffs of private institutions, with a wealth of choices before them, are not likely to be willing to undertake projects under public grants if they are deprived of the freedom of management which they consider necessary and would have in projects not governmentally financed." *Id.* at 102.

Although *Wahba* was not an FOIA case, the court's explanation of the limited relationship between an NIH grantee and the Government is pertinent to plaintiff's suggestion that Government funding is sufficient to characterize work generated by Government grants as Government work concomitant with Government agency records.

6. The minimization of the importance of funding is consonant with the legislative history behind the 1974 Amendments to the FOIA, which states that the amendments "do not intend to include corporations which receive appropriated funds but are neither chartered by the Federal Government nor controlled by it." Conf.Rep. 93–1200, 93d Cong., 2d Sess., 1974 U.S.Code Cong. & Ad.News, 6293.

7. For example, the Court could hardly sanction a holding that would mean that a student who receives a national loan to finance his education would have to disclose the schoolwork generated as a result to any government or individual party claiming an interest.

dominion and control over the raw data. The documentation has remained primarily in the custody of the UGDP group and its coordinating center, and although it was transmitted temporarily to the Government for limited auditing purposes, ownership and control were not conveyed along with it.

▬▬▬ Mere access without ownership and mere reliance without control will not suffice to convert the UGDP data into agency data. Here, the FDA, as a Government agency, referred to reports submitted by the UGDP grantees. It maintained, studied and directly utilized those reports and not their underlying documentation. Just as the Government cannot be compelled to obtain possession of documents not under its control or furnish an opinion when none is written, *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 161, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975); *National Cable Television Assoc., Inc. v. FCC*, 156 U.S.App.D.C. 91, 479 F.2d 183, 192 (1973), it should not be compelled to acquire data it neither referred to directly nor relied upon in making decisions. Hence, this Court agrees with the opinion in *Nichols, supra,* that "the Court may not require production of records not in the custody or control of an agency." 325 F.Supp. at 137. *See also* 41 C.F.R. § 105–60.104–1.

The difference between the FDA's control and use of final reports and its alleged dependence upon underlying documentation may seem slight, but it is a valid distinction in this Court's opinion. First, the Government neither obtained nor needed significant authority over the underlying raw data since it had no plans to conduct its own independent scientific assessment. The data was compiled and assembled according to the methodology of the private research grantees. The FDA neither controlled this aspect of the study nor became officially aware of its work until 1967. (Crout Affidavit ¶ 6). In short, the FDA, which considered the results of the UGDP

research, exerted no control or impact on the conduct of that research.

It has been held that "any report prepared by the agency or its consultants in fulfillment of that [agency's] function must be regarded as a record of the agency." *Soucie, supra,* 448 F.2d at 1076. This holding was relied upon in *Wolfe, supra,* in which the district court ruled that transcripts of a private advisory committee meeting submitted to the FDA along with the committee's report should be disclosed as agency records. Although the transcripts did not constitute a final report, they were in the possession of the agency and used in its deliberations, thereby qualifying as an agency record.

In the instant case, the underlying data from the UGDP research has not been officially surrendered to the FDA, and although the FDA may have access, it does not own the documents. Whether or not the FDA obtained possession of the documents at some particular point in time, it is clear that the FDA did not receive them permanently. This Court cannot rule that mere possession at a particular point in time transforms the nature of the documents. Insofar as *Wolfe* interprets the *Soucie* opinion to the contrary, this Court must disagree. In *Soucie* the court merely held that a report expressly *prepared for* and finally *submitted to* an agency for use in decisionmaking should be disclosed as an agency record within the FOIA.

The proprietary interest of the agency in such a report, as in the *Wolfe* transcripts submitted to the agency for the purpose of aiding its deliberations, is clearly distinguishable from the data in question here, which is permanently held by private parties and not directly utilized in agency decisionmaking.

▬▬▬ The Court finds that the FDA, in formulating proposed regulations, did not rely directly upon the raw data of the UGDP research.[8] The principle is now es-

---

8. In fact, the FDA did not rely solely upon even the results of the UGDP study in formulating the proposed labeling rule. The FDA supplemented those findings with the results of the independently retained Biometrics Society. In addition, in effectuating its rulemaking proce-

tablished that documents directly relied upon or memoranda expressly adopted by an agency in its rulemaking proceedings must be available for public inspection even if the materials in question were prepared by non-agencies. *See Renegotiation Board v. Grumman Aircraft Engineering Corp.,* 421 U.S. 168, 192, 95 S.Ct. 1491, 44 L.Ed.2d 57 (1975); *NLRB v. Sears, Roebuck & Co., supra,* 421 U.S. at 161, 95 S.Ct. 1504; *Bristol-Myers Co. v. FTC,* 138 U.S.App.D.C. 22, 424 F.2d 935, 939–40, *cert. denied,* 400 U.S. 824, 91 S.Ct. 46, 27 L.Ed.2d 52 (1970). Given this rule, it is obvious that by this lawsuit compelling the FDA to include as part of its administrative record the UGDP raw data, plaintiff hopes to improve its efficacy as a participant in the rulemaking proceedings. However, since the Court has not found that the documents were used or relied upon in a direct manner such as would permit their characterization as agency records, there is no basis for requiring the FDA to obtain and disclose the underlying UGDP data as part of its administrative record.[9] The distinction between direct reliance, in whole or in part, upon a summary report and direct reliance (via usage or control) on supporting documentation is necessary to preserve a salutary balance between the public's right to be informed of the grounds for Government decisionmaking and the protection of private interests. *Cf. Rural Housing Alliance v. Dep't of Agriculture,* 162 U.S.App.D.C. 122, 498 F.2d 73, 78 (1974).

Nor can plaintiff show control by NIH over the daily activities of the UGDP grantees in order to infer that their records became official records of NIH. The limited nature of NIH's involvement in the grantees' activities was purposeful and pursuant to its regulations, which prescribe procedures "designed to place greater reliance on grantees to manage the day-to-day operations of their grant-supported activities." 45 C.F.R. § 74.80. Furthermore, the FDA's indirect connection with the raw data is unrelated to the NIH's sponsorship of the UGDP study. Even a count of cumulative Government contacts (albeit by different Government organizations) will not suffice to prove an unequivocal identification of the UGDP raw data as Government records or property.

### Conclusions

In sum, the Court finds that the UGDP functioned as a private organization. The raw data of the research organization's study was its own private property and not Government property. Because there has not been an adequate showing that the underlying data of the researchers was directly controlled or substantially utilized by a Government agency in the performance of governmental operations, the records cannot be deemed "agency records" for the purposes of disclosure under the FOIA.

Accordingly, plaintiff's motion is denied. Defendants' motion for summary judgment is granted, and summary judgment is granted in favor of defendants. The remaining motions of research defendants are denied as moot.

So ordered.

---

dures, the FDA afforded the public an opportunity to comment upon the findings and thus to participate in the proposed policy determination. (*See* Crout Affidavit ¶¶ 11–16).

**9.** It seems that the records of the agencies (FDA, NIH and HEW) contain information currently accessible to plaintiff as well as to any other member of the public documenting how and why the Government awarded grants to the UGDP participants; the audits made by the Government of the grantees; what the Government has done with the reported conclusions of the study; and what the Biometrics Society, as expert consultant, has learned about the UGDP study. (Crout Affidavit ¶ 13).

In cases cited by the plaintiff finding records of a non-agency to be agency records, the non-agency entities involved were performing the work of Government agencies. *See NLRB v. Sears, Roebuck & Co., supra; Washington Research, supra; American Mail Line, Ltd. v. Gulick,* 133 U.S.App.D.C. 382, 411 F.2d 696, 703 (1969).